[Civ. No. 20095. Fourth Dist., Div. Two. May 29, 1981.]

RICHARD GRIMSHAW, a Minor, etc., Plaintiff and Appellant, v. FORD MOTOR COMPANY, Defendant and Appellant.

CARMEN GRAY, a Minor, etc., et al., Plaintiffs and Appellants, v. FORD MOTOR COMPANY, Defendant and Appellant.

762

764

COUNSEL

Hews, Munoz & Howard, Arthur N. Hews, Horvitz & Greines, Horvitz, Greines & Poster, Ellis J. Horvitz, Michelle Van Cleave, Gerald H. B. Kane, Jr., Rose, Klein & Marias, Byron M. Rabin and Leonard Sacks for Plaintiffs and Appellants.

McCutchen, Black, Verleger & Shea, G. Richard Doty, Robert G. Damus, Judd L. Jordan and Harrington, Foxx, Dubrow & Canter for Defendant and Appellant.

OPINION

TAMURA, Acting P. J.—A 1972 Ford Pinto hatchback automobile unexpectedly stalled on a freeway, erupting into flames when it was rear ended by a car proceeding in the same direction. Mrs. Lilly Gray, the driver of the Pinto, suffered fatal burns and 13-year-old Richard Grimshaw, a passenger in the Pinto, suffered severe and permanently disfiguring burns on his face and entire body. Grimshaw and the heirs of Mrs. Gray (Grays) sued Ford Motor Company and others. Following a six-month jury trial, verdicts were returned in favor of plaintiffs against Ford Motor Company. Grimshaw was awarded $2,516,000 compensatory damages and $125 million punitive damages; the Grays

were awarded $559,680 in compensatory damages.[1] On Ford's motion for a new trial, Grimshaw was required to remit all but $3 1/2 million of the punitive award as a condition of denial of the motion.

Ford appeals from the judgment and from an order denying its motion for a judgment notwithstanding the verdict as to punitive damages. Grimshaw appeals from the order granting the conditional new trial and from the amended judgment entered pursuant to the order. The Grays have cross-appealed from the judgment and from an order denying leave to amend their complaint to seek punitive damages.

Ford assails the judgment as a whole, assigning a multitude of errors and irregularities, including misconduct of counsel, but the primary thrust of its appeal is directed against the punitive damage award. Ford contends that the punitive award was statutorily unauthorized and constitutionally invalid. In addition, it maintains that the evidence was insufficient to support a finding of malice or corporate responsibility for malice. Grimshaw's cross-appeal challenges the validity of the new trial order and the conditional reduction of the punitive damage award. The Grays' cross-appeal goes to the validity of an order denying them leave to amend their wrongful death complaint to seek punitive damages.

## FACTS

Since sufficiency of the evidence is in issue only regarding the punitive damage award, we make no attempt to review the evidence bearing on all of the litigated issues. Subject to amplification when we deal with specific issues, we shall set out the basic facts pertinent to these appeals in accordance with established principles of appellate review: We will view the evidence in the light most favorable to the parties prevailing below, resolving all conflicts in their favor, and indulging all reasonable inferences favorable to them. (*Aceves* v. *Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619]; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].)

---

[1] The jury actually awarded Grimshaw $2,841,000 compensatory damages and $125 million punitive damages and the Grays $659,680 compensatory damages. Pursuant to stipulation that sums previously received by plaintiffs from others should be deducted from the amounts awarded by the jury, the judgment was modified to reflect compensatory damages in favor of Grimshaw for $2,516,000 and in favor of the Grays for $559,680.

*The Accident*:

In November 1971, the Grays purchased a new 1972 Pinto hatchback manufactured by Ford in October 1971. The Grays had trouble with the car from the outset. During the first few months of ownership, they had to return the car to the dealer for repairs a number of times. Their car problems included excessive gas and oil consumption, down shifting of the automatic transmission, lack of power, and occasional stalling. It was later learned that the stalling and excessive fuel consumption were caused by a heavy carburetor float.

On May 28, 1972, Mrs. Gray, accompanied by 13-year-old Richard Grimshaw, set out in the Pinto from Anaheim for Barstow to meet Mr. Gray. The Pinto was then 6 months old and had been driven approximately 3,000 miles. Mrs. Gray stopped in San Bernardino for gasoline, got back onto the freeway (Interstate 15) and proceeded toward her destination at 60-65 miles per hour. As she approached the Route 30 off-ramp where traffic was congested, she moved from the outer fast lane to the middle lane of the freeway. Shortly after this lane change, the Pinto suddenly stalled and coasted to a halt in the middle lane. It was later established that the carburetor float had become so saturated with gasoline that it suddenly sank, opening the float chamber and causing the engine to flood and stall. A car traveling immediately behind the Pinto was able to swerve and pass it but the driver of a 1962 Ford Galaxie was unable to avoid colliding with the Pinto. The Galaxie had been traveling from 50 to 55 miles per hour but before the impact had been braked to a speed of from 28 to 37 miles per hour.

At the moment of impact, the Pinto caught fire and its interior was engulfed in flames. According to plaintiffs' expert, the impact of the Galaxie had driven the Pinto's gas tank forward and caused it to be punctured by the flange or one of the bolts on the differential housing so that fuel sprayed from the punctured tank and entered the passenger compartment through gaps resulting from the separation of the rear wheel well sections from the floor pan. By the time the Pinto came to rest after the collision, both occupants had sustained serious burns. When they emerged from the vehicle, their clothing was almost completely burned off. Mrs. Gray died a few days later of congestive heart failure as a result of the burns. Grimshaw managed to survive but only through heroic medical measures. He has undergone numerous and extensive surgeries and skin grafts and must undergo additional surgeries over the next 10 years. He lost portions of several fingers on his left

hand and portions of his left ear, while his face required many skin grafts from various portions of his body. Because Ford does not contest the amount of compensatory damages awarded to Grimshaw and the Grays, no purpose would be served by further description of the injuries suffered by Grimshaw or the damages sustained by the Grays.

*Design of the Pinto Fuel System:*

In 1968, Ford began designing a new subcompact automobile which ultimately became the Pinto. Mr. Iacocca, then a Ford vice president, conceived the project and was its moving force. Ford's objective was to build a car at or below 2,000 pounds to sell for no more than $2,000.

Ordinarily marketing surveys and preliminary engineering studies precede the styling of a new automobile line. Pinto, however, was a rush project, so that styling preceded engineering and dictated engineering design to a greater degree than usual. Among the engineering decisions dictated by styling was the placement of the fuel tank. It was then the preferred practice in Europe and Japan to locate the gas tank over the rear axle in subcompacts because a small vehicle has less "crush space" between the rear axle and the bumper than larger cars. The Pinto's styling, however, required the tank to be placed behind the rear axle leaving only 9 or 10 inches of "crush space"—far less than in any other American automobile or Ford overseas subcompact. In addition, the Pinto was designed so that its bumper was little more than a chrome strip, less substantial than the bumper of any other American car produced then or later. The Pinto's rear structure also lacked reinforcing members known as "hat sections" (two longitudinal side members) and horizontal cross-members running between them such as were found in cars of larger unitized construction and in all automobiles produced by Ford's overseas operations. The absence of the reinforcing members rendered the Pinto less crush resistant than other vehicles. Finally, the differential housing selected for the Pinto had an exposed flange and a line of exposed bolt heads. These protrusions were sufficient to puncture a gas tank driven forward against the differential upon rear impact.

*Crash Tests:*

During the development of the Pinto, prototypes were built and tested. Some were "mechanical prototypes" which duplicated mechanical features of the design but not its appearance while others, referred

to as "engineering prototypes," were true duplicates of the design car. These prototypes as well as two production Pintos were crash tested by Ford to determine, among other things, the integrity of the fuel system in rear-end accidents. Ford also conducted the tests to see if the Pinto as designed would meet a proposed federal regulation requiring all automobiles manufactured in 1972 to be able to withstand a 20-mile-per-hour fixed barrier impact without significant fuel spillage and all automobiles manufactured after January 1, 1973, to withstand a 30-mile-per-hour fixed barrier impact without significant fuel spillage.

The crash tests revealed that the Pinto's fuel system as designed could not meet the 20-mile-per-hour proposed standard. Mechanical prototypes struck from the rear with a moving barrier at 21 miles per hour caused the fuel tank to be driven forward and to be punctured, causing fuel leakage in excess of the standard prescribed by the proposed regulation. A production Pinto crash tested at 21 miles per hour into a fixed barrier caused the fuel neck to be torn from the gas tank and the tank to be punctured by a bolt head on the differential housing. In at least one test, spilled fuel entered the driver's compartment through gaps resulting from the separation of the seams joining the rear wheel wells to the floor pan. The seam separation was occasioned by the lack of reinforcement in the rear structure and insufficient welds of the wheel wells to the floor pan.

Tests conducted by Ford on other vehicles, including modified or reinforced mechanical Pinto prototypes, proved safe at speeds at which the Pinto failed. Where rubber bladders had been installed in the tank, crash tests into fixed barriers at 21 miles per hour withstood leakage from punctures in the gas tank. Vehicles with fuel tanks installed above rather than behind the rear axle passed the fuel system integrity test at 31-miles-per-hour fixed barrier. A Pinto with two longitudinal hat sections added to firm up the rear structure passed a 20-mile-per-hour rear impact fixed barrier test with no fuel leakage.

*The Cost to Remedy Design Deficiencies*:

When a prototype failed the fuel system integrity test, the standard of care for engineers in the industry was to redesign and retest it. The vulnerability of the production Pinto's fuel tank at speeds of 20 and 30-miles-per-hour fixed barrier tests could have been remedied by inexpensive "fixes," but Ford produced and sold the Pinto to the public without doing anything to remedy the defects. Design changes that

would have enhanced the integrity of the fuel tank system at relatively little cost per car included the following: Longitudinal side members and cross members at $2.40 and $1.80, respectively; a single shock absorbant "flak suit" to protect the tank at $4; a tank within a tank and placement of the tank over the axle at $5.08 to $5.79; a nylon bladder within the tank at $5.25 to $8; placement of the tank over the axle surrounded with a protective barrier at a cost of $9.95 per car; substitution of a rear axle with a smooth differential housing at a cost of $2.10; imposition of a protective shield between the differential housing and the tank at $2.35; improvement and reenforcement of the bumper at $2.60; addition of eight inches of crush space a cost of $6.40. Equipping the car with a reinforced rear structure, smooth axle, improved bumper and additional crush space at a total cost of $15.30 would have made the fuel tank safe in a 34 to 38-mile-per-hour rear-end collision by a vehicle the size of the Ford Galaxie. If, in addition to the foregoing, a bladder or tank within a tank were used or if the tank were protected with a shield, it would have been safe in a 40 to 45-mile-per-hour rear impact. If the tank had been located over the rear axle, it would have been safe in a rear impact at 50 miles per hour or more.

*Management's Decision to Go Forward With Knowledge of Defects:*

The idea for the Pinto, as has been noted, was conceived by Mr. Iacocca, then executive vice president of Ford. The feasibility study was conducted under the supervision of Mr. Robert Alexander, vice president of car engineering. Ford's Product Planning Committee, whose members included Mr. Iacocca, Mr. Robert Alexander, and Mr. Harold MacDonald, Ford's group vice president of car engineering, approved the Pinto's concept and made the decision to go forward with the project. During the course of the project, regular product review meetings were held which were chaired by Mr. MacDonald and attended by Mr. Alexander. As the project approached actual production, the engineers responsible for the components of the project "signed off" to their immediate supervisors who in turn "signed off" to their superiors and so on up the chain of command until the entire project was approved for public release by Vice Presidents Alexander and MacDonald and ultimately by Mr. Iacocca. The Pinto crash tests results had been forwarded up the chain of command to the ultimate decision-makers and were known to the Ford officials who decided to go forward with production.

Harley Copp, a former Ford engineer and executive in charge of the crash testing program, testified that the highest level of Ford's management made the decision to go forward with the production of the Pinto, knowing that the gas tank was vulnerable to puncture and rupture at low rear impact speeds creating a significant risk of death or injury from fire and knowing that "fixes" were feasible at nominal cost. He testified that management's decision was based on the cost savings which would inure from omitting or delaying the "fixes."

Mr. Copp's testimony concerning management's awareness of the crash tests results and the vulnerability of the Pinto fuel system was corroborated by other evidence. At an April 1971 product review meeting chaired by Mr. MacDonald, those present received and discussed a report (exhibit 125) prepared by Ford engineers pertaining to the financial impact of a proposed federal standard on fuel system integrity and the cost savings which would accrue from deferring even minimal "fixes."[2] The report refers to crash tests of the integrity of the fuel system of Ford vehicles and design changes needed to meet anticipated federal standards. Also in evidence was a September 23, 1970, report (exhibit 124) by Ford's "Chassis Design Office" concerning a program "to establish a corporate [Ford] position and reply to the government" on the proposed federal fuel system integrity standard which included zero fuel spillage at 20 miles per hour fixed barrier crash by January 1, 1972, and 30 miles per hour by January 1, 1973. The report states in part: "The 20 and 30 mph rear fixed barrier crashes will probably require repackaging the fuel tanks in a protected area such as above the rear axle. This is based on moving barrier crash tests of a Chevelle and a Ford at 30 mph and other Ford products at 20 mph. [¶] Currently there are no plans for forward models to repackage the fuel tanks. Tests must be conducted to prove that repackaged tanks will live without significantly strengthening rear structure for added protection." The report also notes that the Pinto was the "[s]mallest car line with most difficulty in achieving compliance." It is reasonable to infer that the report was prepared for and known to Ford officials in policy-making positions.

---

[2] The "FUEL SYSTEM INTEGRITY PROGRAM FINANCIAL REVIEW" report included the following:

"PRODUCT ASSUMPTIONS

"To meet 20 mph movable barrier requirements in 1973, fuel filler neck modifications to provide breakaway capability and minor upgrading of structure are required.

"To meet 30 mph movable barrier requirements, original fuel system integrity program assumptions provided for relocation of the fuel tanks to over the axle on all car lines beginning in 1974. Major tearup of rear and center floor pans, added rear end

The fact that two of the crash tests were run at the request of the Ford chassis and vehicle engineering department for the specific purpose of demonstrating the advisability of moving the fuel tank over the axle as a possible "fix" further corroborated Mr. Copp's testimony that management knew the results of the crash tests. Mr. Kennedy, who succeeded Mr. Copp as the engineer in charge of Ford's crash testing program, admitted that the test results had been forwarded up the chain of command to his superiors.

Finally, Mr. Copp testified to conversations in late 1968 or early 1969 with the chief assistant research engineer in charge of cost-weight evaluation of the Pinto, and to a later conversation with the chief chassis engineer who was then in charge of crash testing the early prototype. In these conversations, both men expressed concern about the integrity of the Pinto's fuel system and complained about management's unwillingness to deviate from the design if the change would cost money.

---

structure, and new fuel tanks were believed necessary for all car lines. These engineering assumptions were developed from limited vehicle crash test data and design and development work.

"Since these original assumptions, seven vehicle crash tests have been run which now indicate that fuel tank relocation is probably not required. Although still based heavily on judgment, Chassis Engineering currently estimates that the 30 mph movable barrier requirement is achievable with a reduced level of rear end tearup.

"In addition to added rear-end structure, Chassis Engineering believes that either rubber 'flak' suits (similar to a tire carcass), or alternatively, a bladder lining within the fuel tank may be required on all cars with flat fuel tanks located under the luggage compartment floor (all cars, except Ford/Mercury/Lincoln and Torino/Montego station wagons). Although further crash tests may show that added structure alone is adequate to meet the 30 mph movable barrier requirement, provisions for flak suits or bladders must be provided. The design cost of a single flak suit, located between the fuel tank and the axle, is currently estimated at $(4) per vehicle. If two flak suits (second located at the rear of the fuel tank), or a bladder are required, the design cost is estimated at $(8) per vehicle. Based on these estimates, it is recommended that the addition of the flak suit/bladder be delayed on all affected cars until 1976. However, package provision for both the flak suits and the bladder should be included when other changes are made to incorporate 30 mph movable barrier capability. A design cost savings $10.9 million (1974-1975) can be realized by this delay. Although a design cost provision of $(8) per affected vehicle has been made in 1976 program levels to cover contingencies, it is hoped that cost reductions can be achieved, or the need for any flak suit or bladder eliminated after further engineering development.

"Current assumptions indicate that fuel system integrity modifications and 1973 bumper improvement requirements are nearly independent. However, bumper requirements for 1974 and beyond may require additional rear end structure which could benefit fuel system integrity programs."

*The Action:*

Grimshaw (by his guardian ad litem) and the Grays sued Ford and others. Grimshaw was permitted to amend his complaint to seek punitive damages but the Grays' motion to amend their complaint for a like purpose was denied. The cases were thereafter consolidated for trial.[3] Grimshaw's case was submitted to the jury on theories of negligence and strict liability; the Grays' case went to the jury only on the strict liability theory.

## FORD'S APPEAL

Ford seeks reversal of the judgment as a whole on the following grounds: (1) Erroneous rulings relating to Mr. Copp's testimony; (2) other erroneous evidentiary rulings; (3) prejudicial misconduct by plaintiffs' counsel; (4) instructional errors; and (5) jury misconduct. On the issue of punitive damages, Ford contends that its motion for judgment notwithstanding the verdict should have been granted because the punitive award was statutorily unauthorized and constitutionally invalid and on the further ground that the evidence was insufficient to support a finding of malice or corporate responsibility for malice. Ford also seeks reversal of the punitive award for claimed instructional errors on malice and proof of malice as well as on the numerous grounds addressed to the judgment as a whole. Finally, Ford maintains that even if punitive damages were appropriate in this case, the amount of the award was so excessive as to require a new trial or further remittitur of the award.

In the ensuing analysis (ad nauseam) of Ford's wide-ranging assault on the judgment, we have concluded that Ford has failed to demonstrate that any errors or irregularities occurred during the trial which resulted in a miscarriage of justice requiring reversal.

### I

### THE TESTIMONY OF HARLEY COPP

Mr. Harley Copp, a former Ford engineering executive, was plaintiffs' principal witness on the subject of defects in the design, placement, and protection of the Pinto's gas tank and on Ford manage-

---

[3]Plaintiffs settled with the other defendants before and during trial; the case went to verdict only against Ford Motor Company.

ment's decision to place the car on the market with knowledge of the defects. Ford assails Mr. Copp's testimony on three basic grounds: (1) He should not have been permitted to testify at all because plaintiffs failed to disclose his identity before trial and because Ford was denied the opportunity to depose him; (2) he should not have been allowed to testify during direct examination to the reason for his termination by Ford; and (3) he should not have been permitted to testify on direct examination concerning the contents of reports, studies, and tests on which he relied in forming his opinions.

(1) *Rulings Pertaining to Copp's Identity and Requests to Depose Him*:

After trial had been under way for a month, defense counsel made an oral motion for the disclosure of the identity of "any disgruntled Ford employee or former employee" whom plaintiffs intended to call as a witness and for the opportunity to depose him before he was called as a witness. Plaintiffs objected on the ground that Ford had the opportunity in the course of pretrial discovery to seek the identity of plaintiffs' experts and to depose them and that to permit depositions to be taken at that stage of the proceedings would interrupt the trial unduly. Plaintiff's counsel (Mr. Hews) stated that he intended to call a former Ford employee but declined to reveal his identity except to the court outside the presence of defense counsel. The judge conducted an unreported *in camera* inquiry of plaintiffs' counsel following which the judge dictated an account of the proceedings and ordered the transcript sealed. Thereafter, the court denied Ford's motion, stating: (1) That the witness whom plaintiffs intended to call was contacted after plaintiffs had responded to defendants' last request for a list of plaintiffs' expert witnesses; (2) defendants had ample opportunity to learn the witness' name and to depose him through pretrial discovery procedure; and (3) that to permit a deposition at that stage of the trial would interrupt the progress of the trial unduly. Ford did not object to the *in camera* proceedings or request disclosure of the matters revealed to the judge, did not ask for an opportunity to rebut anything that might have been said, and did not object to the court's consideration of matters disclosed during the *in camera* proceeding in making its ultimate ruling.[4]

---

[4]The judge's account of the *in camera* inquiry of plaintiffs' counsel (Mr. Hews, Mr. Robinson, Mr. Rubin) was in substance as follows: Mr. Hews represented to the court that since Ford's last request for a list of plaintiffs' expert witnesses, he had come upon three (or four) individuals, two (or three) of whom were employees of Ford dealers and

After plaintiffs called Mr. Copp as a witness (without objection) and during the course of his direct examination, Ford twice moved orally to depose Mr. Copp before he continued with his testimony. The court denied the motions as untimely and on the further ground that Ford would not be prejudiced by lack of prior opportunity to depose the witness in light of its broad power to cross-examine him.

■ Ford contends that the court should have barred Mr. Copp from testifying because of plaintiffs' failure to disclose his identity during pretrial discovery or, at the very least, that the court abused its discretion in denying Ford's motion to depose him before he testified. The contentions lack merit.

■ A party can be compelled to identify the experts whom he contemplates calling as witnesses and such experts may, upon good cause shown, be deposed by the other party. (*Bolles* v. *Superior Court* (1971) 15 Cal.App.3d 962, 963 [93 Cal.Rptr. 719]; *Scotsman Mfg. Co.* v. *Superior Court* (1962) 242 Cal.App.2d 527, 530-532 [51 Cal.Rptr. 511]; *Swartzman* v. *Superior Court* (1964) 231 Cal.App.2d 195, 204 [41 Cal.Rptr. 721]; Louisell & Walley, Modern Cal. Discovery (2d ed. 1972) § 5.12, p. 337.) A party can also be compelled at an appropriate stage of the proceedings before trial to elect whether or not he will call as a witness an expert with whom he has consulted in trial preparation and to disclose his election to his adversary. (*Sanders* v. *Superior Court* (1973) 34 Cal.App.3d 270, 279-280 [109 Cal.Rptr. 770].) If the party elects to call the expert as a witness, the opposing party should be granted a reasonable time within which to conduct appropriate additional discovery. (*Id.,* at p. 279.)

Willful failure to disclose the identity of an expert whom the party intends to call as a witness may justify exclusion of his testimony. (*Thoren* v. *Johnston & Washer* (1972) 29 Cal.App.3d 270, 274-275 [105 Cal.Rptr. 276]; Code Civ. Proc., § 2019, subd. (b), § 2034, subd.

---

the other a retired Ford employee who had been active in design. Mr. Hews told the judge that the retired Ford employee reported that he had been subject to surveillance, that he suspected his phone had been tapped, and that a pension to which he was entitled had been delayed. Mr. Hews expressed fear that if the names of the witnesses were revealed they might not be available as plaintiffs' witnesses. He further stated that defense counsel was aware in early July 1977 of plaintiffs' contact with the retired design engineer. Mr. Robinson, one of the attorneys for plaintiffs, stated that if Ford's motion were to be granted, plaintiffs would as a matter of fairness seek the names of witnesses and experts acquired by Ford after the last exchange of information and depose such witnesses, all of which would result in undue delay of the trial.

(b).) However, where it appears that a decision to call a new and different expert is made after the response to a compelled election and was not willfully delayed in violation of the spirit of the discovery rules, the failure to exclude such expert's testimony is not an abuse of discretion. (*Rangel* v. *Graybar Electric Co.* (1977) 70 Cal.App.3d 943, 948 [139 Cal.Rptr. 191]; see *Deyo* v. *Kilbourne* (1978) 84 Cal.App.3d 771, 780, fn. 4 [149 Cal.Rptr. 499]; Powers, *A Guide to Interrogatories in California Practice* (1975) 48 So.Cal.L.Rev. 1221, 1256-1257.) It has been said that interrogatories should not be permitted to be used as a trap "pinning a party for all time to an answer intended to reflect only that party's knowledge as of the date of the answer." (*Id.*, at p. 949; see *Singer* v. *Superior Court*, 54 Cal.2d 318, 324-326 [5 Cal.Rptr. 697, 353 P.2d 305]; Powers, *supra*.)

In the present case, the evidence discloses the following chronology of events respecting identification of plaintiff's expert witnesses. Plaintiffs' responses to Ford's demand for the names of the experts and to codefendant Wilson-Ford's motion to compel election were filed before January 10, 1977. The responses listed the experts and added: "Plaintiff is presently engaging in trial preparation which includes extensive additional investigation into Ford Pinto, which may lead to additional expert witnesses." Plaintiffs' counsel met Mr. Copp for the first time on January 18, 1977, and learned of his potential availability as a witness.

Whether there has been a willful failure to disclose the identity of an expert witness is a matter to be determined by the trial court and its finding will not be disturbed unless it is so lacking in evidentiary support or is so arbitrary as to constitute an abuse of discretion. (*Rangel* v. *Graybar Electric Co., supra*, 70 Cal.App.3d 943, 948; see also *Fairfield* v. *Superior Court* (1963) 246 Cal.App.2d 113, 118-121 [54 Cal.Rptr. 721].) The trial court found that plaintiffs' responses to Ford's demand for a list of the expert witnesses and to codefendant's motion for election contained a full, accurate, and complete list of persons then known to plaintiffs who would be called; that the person whose identity Ford was seeking was "acquired" by plaintiffs after defendant's last request for a list of experts; and that Ford had ample opportunity through pretrial discovery to learn the name of plaintiffs' additional expert and to depose him. As we explain below, there is substantial evidentiary support for those findings.

That the first contact between plaintiffs' attorneys and Mr. Copp occurred on January 18, 1977, was confirmed by Mr. Copp's testimony

and was and is unchallenged by Ford. Plaintiffs' response made it clear to defendant that the experts listed were those then known to plaintiffs, that plaintiffs were continuing a nationwide investigation and that other experts might be discovered. Thus, defendant can be said to have been on notice that plaintiffs' investigatory work might uncover additional witnesses. Defendant's brief suggests that plaintiffs had a burden to give them notice of any expert witnesses found after the election had been made. However, because defendant's interrogatories were not continuing, plaintiffs had no obligation under the then existing law to update the list as additional experts were found who might be called as witnesses.[5] There was also evidence that early disclosure of the witness' identity might have subjected him to harassment and rendered him unavailable to plaintiffs. There was thus ample evidentiary support for the implied finding that there had been no willful suppression of Mr. Copp's identity as a potential expert witness. There was also evidence to support the finding that defendants had ample opportunity through pretrial discovery to ascertain Mr. Copp's identity and to depose him. There was indication that Ford's counsel knew as early as June 1977 that Mr. Copp might be a witness for plaintiffs. That Ford's oral motion was for the disclosure of any former "disgruntled" Ford employee who might be called as plaintiffs' witness and that Ford's motion was made only after and in apparent response to one made by plaintiffs for the disclosure of a possible Ford witness suggest that Ford knew the identity of the witness.[6]

---

[5]Whether continuing interrogatories were then even proper in California appears to have been an open question. (*Rangel v. Graybar Electric Co., supra,* 70 Cal.App.3d 943, 950; *Kenney* v. *Superior Court* (1967) 255 Cal.App.2d 106, 112, fn. 5 [63 Cal.Rptr. 84]; *Smith* v. *Superior Court* (1961) 189 Cal.App.2d 6, 11 [11 Cal.Rptr. 165, 88 A.L.R.2d 650]; Cal. Civil Discovery Practice (Cont.Ed.Bar Supp. Oct. 1979) § 8.22, p. 47.)

After the initiation of trial, the Legislature added a new article to title 3, part 4, chapter 3 of the Code of Civil Procedure (Code Civ. Proc., § 2037 et seq.) pertaining to discovery of expert witnesses. Section 2037.4 provides: "A party who is required to exchange lists of witnesses shall diligently give notice to the parties upon whom his list was served if, after service of his list he determines to call an expert witness not included in his list, and a party shall make available for deposition such expert witnesses as he has determined to call."

Under the federal rules, interrogatories concerning experts are "continuing interrogatories." (Fed. Rules Civ. Proc., rule 26(e)(1); Louisell & Wally, Modern Cal. Discovery, *supra,* § 5.12, p. 338.)

[6]The record reveals that Ford's motion to require plaintiffs to disclose the identity of any "disgruntled" former Ford employee whom they intended to call was triggered by plaintiffs' motion for the identity of the person who developed a federal governmental report on which Ford purported to base a press release concerning the safety of the Pinto. The press release had just been issued at time of trial and was receiving wide

■ Ford complains that, because the trial court's ruling was based on evidence taken at the *in camera* proceeding from which Ford was excluded, the ruling violated Ford's due process right and constituted reversible error per se. No authorities are cited to support this contention and we find none. By its failure to object to the *in camera* proceeding, or to the court's consideration of matters revealed *in camera*, or to request an opportunity to respond thereto, Ford waived its right to assert that the proceedings were improper. Procedural irregularities or erroneous rulings in connection with the relief sought or defenses asserted will not be considered on appeal where a timely objection could have been made but was not made in the court below. (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 794 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Nanny* v. *Ruby Lighting Corp.* (1952) 108 Cal.App.2d 856, 859 [239 P.2d 885]. 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 276, pp. 4264-4265.) The rationale for this rule was aptly explained in *Sommer* v. *Martin* (1921) 55 Cal.App. 603 at page 610 [204 P. 33] (quoting the following passage from 1 Hayne on New Trial and Appeal, § 103): "'In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.'"

■ Turning to Ford's motions to depose Mr. Copp before he continued with his direct testimony, we find no abuse of discretion in the court's rulings. The right to conduct discovery "within 30 days before trial" is within the sound discretion of the trial court and in exercising its discretion the court is required to take into consideration the necessity and reasons for such discovery, the diligence or lack of diligence of the party seeking such discovery and his reasons for not having com-

---

media coverage. Ford agreed to disclose the identity of the person who developed the report and to permit him to be deposed if it decided to call him as a witness and the court so ordered. It was then that Ford made its motion to require "as a matter of reciprocity" that plaintiffs disclose the identity of any "disgruntled" former Ford employee they intended to call. After the court ruled on Ford's motion, Ford again alluded to plaintiffs' motion, pointing out that the government report it intended to use was equally available to both parties. The court then indicated it would modify its earlier order to require only that Ford disclose the identity of the person who developed the report. At this point plaintiffs' counsel withdrew their motion for disclosure.

pleted his discovery prior to 30 days before trial, whether permitting such discovery will prevent the case from going to trial on the day set or otherwise interfere with the trial calendar or result in prejudice to any party, and any other matter relevant to the request. (Cal. Rules of Court, rule 222; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 49, p. 2889.) The court was justified in denying Ford's motions for its failure to exercise due diligence and because the granting of the motions would have caused an undue interruption in the orderly progression of the trial.

(2) *Copp's Testimony Concerning the Reasons for His Termination by Ford*:

On direct examination, Mr. Copp testified to his employment history with Ford, including positions he held with the company in the United States and England and the date on which he left Ford. He testified he was forced to take an early retirement and, over defendant's objection, was permitted to explain that this was because he spoke out on matters of safety. The court ruled that evidence of the circumstances under which Mr. Copp left Ford was admissible because it bore upon his credibility and was necessary to enable the jury to understand and evaluate his testimony.

■ Ford maintains that the evidence was inadmissible on direct examination because the witness' credibility had not yet been challenged and that Ford was prejudiced by the erroneous ruling because it was compelled to cross-examine Mr. Copp concerning the reasons for his termination, in turn enabling plaintiffs to introduce prejudicial rehabilitation testimony not otherwise admissible. Ford relies on the general proposition that evidence to support the credibility of a witness is inadmissible until there has been an attempt to impeach; that until a witness' credibility has been attacked, there is nothing to rehabilitate. (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 39 [9 Cal.Rptr. 793, 357 P.2d 1049]; Witkin, Cal. Evidence (2d ed. 1966), § 1276, p. 1180; Jefferson, Cal. Evidence Benchbook, § 28.14, pp. 488-489, 492-493. See Evid. Code, §§ 790, 791.)

If the court's ruling was proper under any theory, however, it must be upheld. ■ A ruling correct in law will not be disturbed on appeal simply because given for a wrong reason; if right on any applicable theory of law, it must be sustained. (*D'Amico* v. *Board of Medical Ex-*

*aminers* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].) The principle applies to evidentiary rulings. (*Wilcox* v. *Berry* (1948) 32 Cal.2d 189, 192 [195 P.2d 414]; *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; *Southers* v. *Savage* (1961) 191 Cal. App.2d 100, 105 [12 Cal.Rptr. 470].) ▪ Assuming that enhancing the witness' credibility was not a valid independent basis for the court's ruling, the evidence was nevertheless admissible (1) because it went to the witness' qualification as an expert and (2) because it was relevant to the issue of malice on Grimshaw's claim for punitive damages.

▪ A party offering an expert witness is entitled to examine him "as to his qualifications and experience so that the full weight to be accorded his testimony will become apparent." (*Moore* v. *Belt* (1949) 34 Cal.2d 525, 532 [212 P.2d 509]; *Salmon* v. *Rathjens* (1907) 152 Cal. 290, 299 [92 P. 733].) Such examination "should not be limited by narrow and stringent rules." (*Eble* v. *Peluso* (1947) 80 Cal.App.2d 154, 156-157 [181 P.2d 680].) ▪ It was therefore within the court's discretion to permit plaintiffs to elicit from Mr. Copp testimony as to when he left Ford and why. Evidence as to why he left Ford was part of the background information concerning the witness' professional experience which would assist the fact finder in determining the weight to be given to his testimony. While the evidence may also have tended to enhance the witness' credibility, the purpose of permitting a party producing an expert to question him as to his educational background, training, and experience in his area of expertise is not only to establish "the competency of the witness to the satisfaction of the court, but also for the purpose of making plain the strength of the witness's [*sic*] grounds of knowledge and the reason for trusting his belief." (*Salmon* v. *Rathjens, supra,* 152 Cal. 290, 299; 2 Wigmore, Evidence (Chadbourne rev. 1979) §§ 562, subd. (2), 655, pp. 759-760, 884-886.) Therefore, the fact that the evidence may have enhanced the witness' credibility did not render it inadmissible.

Additionally, the circumstances surrounding Mr. Copp's termination were relevant to the issue of malice on the claim for punitive damages. "[A]ll relevant evidence is admissible" except as otherwise provided by statute. (Evid. Code, § 351.) Relevant evidence means evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

■ The general test of relevancy is whether the evidence tends logically, naturally and by reasonable inference to establish a material fact. (*People* v. *Warner* (1969) 270 Cal.App.2d 900, 907 [76 Cal.Rptr. 160].) "Evidence tends 'in reason' to prove a fact when 'the evidence offered renders the desired inference more probable than it would be without the evidence.' [Citations.] Evidence is relevant not only when it tends to prove or disprove the precise fact in issue but when it tends to establish a fact from which the existence or nonexistence of the fact in issue can be directly inferred. [Citations.] The trial court is vested with wide discretion in deciding relevancy." (*Id.*, at pp. 907-908, italics deleted; *People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468]; *Cramer* v. *Morrison* (1979) 88 Cal.App.3d 873, 879 [153 Cal.Rptr. 865].) ■ Circumstantial evidence is admissible to establish motive, knowledge or state of mind since direct evidence on such facts is rarely available. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 923, fn. 6 [148 Cal.Rptr. 389, 582 P.2d 980]; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 66 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) The fact that Ford fired a high ranking engineering executive for advocating automotive safety was indicative of Ford management's attitude towards safety in automobile production and was thus relevant to the issue of malice. It had a tendency in reason to prove that Ford's failure to correct the Pinto's fuel system design defects, despite knowledge of their existence, was deliberate and calculated. Ford's argument that firing Mr. Copp in 1976 for speaking out on safety does not reasonably tend to show that Ford disregarded safety in designing the Pinto some five years earlier lacks merit. The evidence was not that Mr. Copp first took his stand on safety in 1976; he testified that he had been outspoken on auto safety during all the many years he worked for Ford.

Ford complains that since Mr. Copp was permitted to testify to the circumstances surrounding his termination, Ford was compelled to cross-examine him to show that the reason for his dismissal was unexplained absences from work and unsatisfactory work performance; that if the court had not permitted Mr. Copp to give his version of the reason for termination, Ford would have had little or no reason to examine him about his retirement and plaintiffs would not have been able to adduce rehabilitation testimony highly prejudicial to Ford. The record discloses that Mr. Copp testified only briefly concerning the circumstances of his early retirement from Ford but that on cross-examination

Ford engaged in extensive questioning to show that the reason for his termination was not his safety views but unsatisfactory work and absenteeism. Plaintiffs thereafter introduced rehabilitating testimony. Mr. Copp was permitted to testify to his campaign for automotive safety during his entire period of employment with Ford, including a conversation he had with Henry Ford II on the subject, his testimony before a United States Senate Committee concerning the Chevrolet Corvair's unsafe design and his role in exposing Ford's conduct in connection with the emission control program. Ford argues that but for the court's erroneous initial ruling and its consequent cross-examination on the reason for Mr. Copp's retirement, the damaging rehabilitation evidence would not have come in. Since we find no error in the court's initial ruling and since Ford has not advanced any independent reason why the rehabilitating evidence should have been excluded, Ford's complaint concerning the prejudicial nature of that evidence must be rejected.

(3) *Mr. Copp's Testimony Concerning Matters Relied Upon in Forming His Opinion:*

Ford complains that the court erroneously permitted Mr. Copp to testify on direct examination to the contents of the literature, reports and tests on which he relied in forming his opinions. Ford cites five such instances: Testimony concerning examples of vehicles meeting a 50-mile-per-hour moving barrier test without fuel tank rupture and fire; testimony that field reports proved over-the-axle fuel tank position to be superior in design; testimony about a proposal United States Steel Co. made to Ford concerning a bladder within a tank; testimony that he based his opinion that a bladder within a tank was feasible in 1969 and 1970 on the fact that Ford had started testing such a device in 1967 and that United States Steel had successfully built such a tank that withstood up to 30-miles-per-hour fixed barrier crash tests without puncturing; and testimony that during his career he had seen the results of several hundred over-the-axle tests published in journals and that there was not one reported fuel tank failure in any of them regardless of the speed of the tests. Ford contends that in the cited instances Mr. Copp was permitted to testify concerning details of the hearsay matters on which he relied in forming his opinion.

While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the

details of such matters if they are otherwise inadmissible. (*People v. La Macchia* (1953) 41 Cal.2d 738, 744-745 [264 P.2d 15], overruled on other grounds in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680]; *Baily v. Kreutzmann* (1904) 141 Cal. 519, 521-522 [75 P. 104]; *Intoximeters, Inc.* v. *Younger* (1975) 53 Cal.App.3d 262, 273 [125 Cal.Rptr. 864]; *Furtado v. Montecello Unified Sch. Dist.* (1962) 206 Cal.App.2d 72, 79-80 [23 Cal.Rptr. 476]; *People v. Nahabedian* (1959) 171 Cal.App.2d 302, 310-311 [340 P.2d 1053].) The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence. (*People v. La Macchia, supra*, 41 Cal.2d 738.) Ordinarily, the use of a limiting instruction that matters on which an expert based his opinion are admitted only to show the basis of the opinion and not for the truth of the matter cures any hearsay problem involved, but in aggravated situations, where hearsay evidence is recited in detail, a limiting instruction may not remedy the problem. (Evid. Code, §§ 352, 355; see *Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281, 289 [144 Cal.Rptr. 241]; *Kelley v. Bailey* (1961) 189 Cal.App.2d 728, 738 [11 Cal.Rptr. 448]; see also *Adkins v. Brett* (1920) 184 Cal. 252, 258 [193 P. 251].) The court is not required to give such limiting instructions *sua sponte.* (Evid. Code, § 355; *Kelley v. Bailey, supra*, 189 Cal.App.2d 728, 738; see e.g., *People v. Richards* (1976) 17 Cal.3d 614, 618-619 [131 Cal.Rptr. 537, 552 P.2d 97].) Mr. Copp was not permitted to testify concerning the details of the hearsay matters on which he relied in forming his opinion.

In the instant case, the record shows that in at least three of the instances cited by Ford, it made no objection on the ground now asserted on appeal. In addition, most of the matters to which Mr. Copp referred were within his personal knowledge and experience. When Mr. Copp was permitted to testify to the matters on which he based his opinion that the bladder within a tank was feasible, the judge gave the jury a proper limiting instruction at Ford's request. Ford would have been entitled to like limiting instructions in other instances had it made such requests but it did not do so. Finally, in no instance was Mr. Copp permitted to read the reports or documents to which he referred or relate their contents in specific detail. In light of these circumstances, we conclude that the court did not commit reversible error in the cited instances where the expert was permitted to testify to the matters he considered in forming his opinions.

## II

### OTHER EVIDENTIARY RULINGS

Ford contends that the court erroneously admitted irrelevant documentary evidence highly prejudicial to Ford. We find the contention to be without merit.

(1) *Exhibit No. 125*:

Exhibit No. 125 was a report presented at a Ford production review meeting in April 1971, recommending action to be taken in anticipation of the promulgation of federal standards on fuel system integrity. The report recommended, inter alia, deferral from 1974 to 1976 of the adoption of "flak suits" or "bladders" in all Ford cars, including the Pinto, in order to realize a savings of $20.9 million. The report stated that the cost of the flak suit or bladder would be $4 to $8 per car. The meeting at which the report was presented was chaired by Vice President Harold MacDonald and attended by Vice President Robert Alexander and occurred sometime before the 1972 Pinto was placed on the market. A reasonable inference may be drawn from the evidence that despite management's knowledge that the Pinto's fuel system could be made safe at a cost of but $4 to $8 per car, it decided to defer corrective measures to save money and enhance profits. The evidence was thus highly relevant and properly received. (See Evid. Code, §§ 210, 351.)

Ford's contention appears to be addressed not so much to the admissibility of exhibit No. 125 but to the use which Grimshaw's counsel made of it in his argument to the jury. Ford complains that while exhibit No. 125 recommended "that $100 million be spent," Grimshaw's counsel argued that the report showed $100 million would be saved and urged the jury to award that sum as punitive damages. It is not clear that exhibit No. 125 recommended that "$100 million be spent"; it states that over the period 1973 to 1976 the cost estimates to meet the federal standards would be $100 million. Nor is the record clear that Grimshaw's counsel was referring to exhibit No. 125 when he urged the jury to award punitive damages in the sum of $100 million. In any event, Ford failed to object to counsel's argument as a misstatement of the evidence. ■ In the absence of an objection and a request for admonition where the admonition would have cured the harm, the issue may not be raised on appeal. (*Horn* v. *Atchison, T. & S.F. Ry. Co.*, 61

Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561], cert. den. *Atchison T. & S.F. Ry. Co.* v. *Horn* (1964) 380 U.S. 909 [13 L.Ed.2d 736, 85 S.Ct. 892]; *Brokopp* v. *Ford Motor Co.* (1977) 71 Cal.App.3d 841, 859-860 [139 Cal.Rptr. 888, 93 A.L.R.3d 537].)

(2) *Exhibits Nos. 95 and 122*:

Ford urges that a report (exhibit No. 95) and a motion picture depicting Ford's crash test No. 1616 (exhibit No. 122) should have been excluded because they were irrelevant and highly prejudicial to Ford in that they showed that in a 21.5-mile-per-hour crash of a 1971 Pinto prototype into a fixed barrier the filler neck of the fuel tank separated allowing fluid to spill from the tank, whereas no such filler neck separation occurred in the Gray vehicle. Under the test for ascertaining relevancy of evidence to which we have previously alluded, we find no abuse of discretion in the court's ruling. Not only did the filler neck separation show the vulnerability of the Pinto fuel system in a 21.5-mile-per-hour fixed barrier test, but crash test No. 1616, as Ford conceded, resulted in a puncture of the fuel tank from the exposed bolt heads on the differential housing. Thus, the exhibits showed the defect in the Pinto's gas tank location and design, the hazard created by the protrusions on the differential housing, and, in addition, they served as evidence of Ford's awareness of those defects. Exhibits Nos. 95 and 122 were properly received in evidence.

(3) *Exhibit No. 82*:

Ford contends admission into evidence over its objection of a report known as the "Chiara memorandum" (plaintiffs' exhibit No. 82) was error. The report, dated February 1971, was a Ford engineering study of the costs of a proposal for a fuel tank over the axle and a tank within a tank for a Ford-Mercury automobile. Ford argues that the study was irrelevant because it pertained to an entirely different car to be built four years later. Mr. Copp testified, however, that the information in the study could be applied equally to the Pinto. The study showed that the cost of placing the gas tank over the axle with protective. shield was about $10 and that a tank within a tank with polyurethane foam between tanks would have cost about $5. Whether the probative value of the evidence was outweighed by the danger of undue prejudice was a matter for the trial judge. (Evid. Code, § 352; e.g., *Cramer* v. *Morrison, supra,* 88 Cal.App.3d 873, 884-885; *Celli* v. *Sports Car Club of America, Inc.* (1972) 29 Cal.App.3d 511, 522 [105

Cal.Rptr. 904].) In the circumstances, we find no abuse of discretion in the judge's determination.

(4) *Exclusion of Evidence Proffered by Ford*:

Ford contends that two items which it attempted to introduce into evidence were erroneously excluded. One was a statistical study from an accident data bank maintained by the State Patrol of the State of Washington. Ford sought to introduce the evidence to show that proportionately the Pinto produced no greater chance of injury or death from fire than other vehicles. The court sustained plaintiff's objections to the evidence on the ground its probative value was at best minimal whereas the prejudicial effect was substantial. In addition, the court felt that the admission of the evidence would confuse the jury and would result in undue consumption of time. (See Evid. Code, § 352; *Cramer* v. *Morrison, supra*, 88 Cal.App.3d 873, 884-885; *Celli* v. *Sports Car Club of America, Inc., supra*, 29 Cal.App.3d 511, 522.) We fail to find an abuse of discretion in the court's ruling.

First, the excluded study encompassed only a small number of collisions which resulted in Pinto fires, thus rendering the sampling open to misleading inferences. Furthermore, the reliability of the field reports from which the data were extracted and fed into the computer was questionable both because of the lack of adequate instruction concerning the information requested as well as the absence of any check on the accuracy of the information provided. Finally, the report and statistics covered the period 1970-1976. Inasmuch as the Pinto underwent substantial modifications during 1973 and thereafter, the reports may not have given a true picture of the earlier versions of the Pinto.

Ford also contends that its offer to prove that Mr. Freers, Ford's chief light car engineer, purchased a Pinto for his family when the Pinto first went on the market was erroneously refused. The record, however, fails to reflect any such offer of proof and Ford does not contend otherwise. This court is limited to reviewing matters appearing of record. (*Bardessono* v. *Michels, supra*, 3 Cal.3d 780, 784; *Nanny* v. *Ruby Lighting Corp., supra*, 108 Cal.App.2d 856, 859; 6 Witkin, Cal. Procedure (2d ed.) *supra*, pp. 4264-4265.) Furthermore, even if an offer of proof had been made and the court had erroneously denied it, the error would not have resulted in a miscarriage of justice compelling reversal. (See 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 304, p. 4287.)

## III

### ALLEGED MISCONDUCT OF COUNSEL

Ford recites a litany of alleged misconduct by plaintiffs' counsel which, it urges, effectively denied it a fair trial. The charges range from alleged violations of orders *in limine*, to asking questions suggesting Ford had been guilty of criminal conduct in an unrelated matter, framing questions containing factual assumptions not supported by the record, to misconduct in arguments to the jury.

(1) *Alleged Violations of an Order in Limine*:

At the commencement of trial the court, on Ford's motion, made an order *in limine* that counsel not mention any other Pinto fires without first approaching the bench and obtaining a ruling. Ford contends that plaintiffs' counsel violated that order on two occasions and that the court erred in denying Ford's motion for a mistrial for those violations.

The first instance pertained to a question propounded by the Grays' counsel to a highway patrol officer who investigated the accident as to whether he had ever seen a Pinto involved in an accident with a standard sized automobile and whether the Pinto burned. Ford objected and moved for a mistrial. The judge sustained Ford's objection, denied the motion for mistrial, and admonished the jury that the question was not evidence and that both question and answer should be disregarded.

The second instance of a charged violation of the order *in limine* arose out of a question Grimshaw's counsel asked Ford's engineer, Mr. Kennedy. The witness was being examined on the Pinto's vulnerability in rear-end collisions and had testified that based on performance, the Pinto had performed better than "the general population in this particular respect." Pressed for the source of his information, Mr. Kennedy admitted he was relying upon a Ford press release which he said was based on government statistics and field performance. Plaintiffs' counsel thereupon asked the witness whether he acknowledged that the following statement appeared in a governmental report: "On each occasion the Ford Pinto gas tank buckled and gas spewed forth. Fire totally gutted the vehicle. Statistics ... [record unclear] ... indicate that three such conflagrations were experienced by one rental agency in a six month period, demonstrating a clear and present hazard to all Pinto owners." Ford objected and immediately moved for a mistrial on the

ground that the question violated the order *in limine* and that the subject matter of the question was prejudicial to its case. Plaintiffs' counsel argued that the question was proper because the witness had interjected statistics reportedly based on field performances and government reports to defend Pinto's performance but conceded he should have approached the bench and obtained a ruling before he asked the question. The court denied the motion for a mistrial but admonished plaintiffs' counsel that it would not hesitate to grant a mistrial if counsel did not "proceed with utmost care." In open court the judge sustained Ford's objection and admonished the jury to disregard the question and to draw no inferences from it.

As to the first alleged violation, the record is not entirely clear concerning the intended scope of the initial *in limine* order. In ruling on the motion for mistrial, the judge recalled that the order was made before counsel's opening statements and was to the effect that no reference be made in the opening statements to other Pinto fires without first approaching the bench. ▇▇▇ In any event, the question could not have affected the verdict in view of the prompt admonition to the jury to disregard the question and in view of the judge's frequent admonitions throughout the trial that counsel's questions were not evidence and that no inferences were to be drawn from them. (See 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 164, pp. 2984-2985, and cases cited therein.)

As to the second alleged misconduct relating to the order *in limine*, the question arguably may have been within the scope of proper cross-examination of the adverse expert witness but there is no doubt that failure to approach the bench before asking the question violated the ground rule which had been clarified after the first incident. The trial court, however, was in the best position to evaluate the effect of the misconduct. It made that assessment in ruling on the motion for a mistrial and later in passing on Ford's motion for a new trial in which one of the grounds was the asserted misconduct of counsel in violating the order *in limine*. In denying both motions, the trial judge impliedly determined that the misconduct did not result in prejudice and that the verdict was not the result, in whole or in part, of the charged misconduct. ▇▇▇ Such determinations by the trial court may not be disturbed on appeal unless they are patently wrong. (*Stevens* v. *Parke, Davis & Co.* (1973) 9 Cal.3d 51, 72 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059]; *Cope* v. *Davison* (1947) 30 Cal.2d 193, 203 [180 P.2d 873, 171 A.L.R. 667].) We cannot say that the trial judge's im-

plied assessment of the effect of the charged misconduct on the verdict was manifestly wrong.

(2) *Questions Relating to Ford's Compliance With Federal Emission Standards*:

Ford contends that plaintiffs' counsel was guilty of misconduct in attempting to get before the jury the fact that Ford had doctored its records to show compliance with federal emission standards, a subject which Ford says was irrelevant to the integrity of the Pinto's fuel system. The matter first came up during redirect-examination of Mr. Copp. When asked about his position relative to Ford's compliance with the federal emission standards, Mr. Copp responded that Ford maintained two computer printouts, one of which was doctored to show compliance and was used to report that fact to the government, and that he had investigated this "fraud" and called it to the attention of Ford executives. He was then asked whether this situation resulted in criminal charges against Ford. Ford objected and moved for a mistrial. The objection was sustained but the motion for mistrial was denied and the jury was admonished to disregard the question. The second time the matter came up was during plaintiff's cross-examination of Mr. Tubben, Ford's engineering expert, concerning Ford's procedure in certifying compliance with federal regulations. He was asked whether Ford kept two files in order to pass federal emission standards. Objection and a motion for mistrial ensued. The court sustained the objection but denied the mistrial.

The questions were arguably proper in both of the above-described instances. Mr. Copp's testimony concerning the emission control matter tended to rebut Ford's evidence that Mr. Copp was fired for absenteeism and unsatisfactory performance. Cross-examination of Mr. Tubben on the subject of compliance with federal emission controls tended to impeach his testimony that the Pinto met all federal regulations. The court nevertheless sustained Ford's objections to the questions, presumably on the basis that the prejudicial effect of the evidence outweighed its probative value, but denied the mistrial motions. We find no abuse of discretion in the court's ruling denying a mistrial. There were sufficient bases for the court's implied determination that the questions were not asked in bad faith and that the admonitions to the jury would avoid the harmful effect of the questions. (See e.g., *Tobler v. Chapman* (1973) 31 Cal.App.3d 568, 576-577 [107 Cal.Rptr. 614]; *Tellefsen v. Key System Transit Lines* (1958) 158 Cal.App.2d 243, 246-247 [322

P.2d 469, 67 A.L.R.2d 556]; 4 Witkin, Cal. Procedure (2d ed.) *supra,* pp. 2984-2986.)

### (3) *The Form of Questions Propounded by Plaintiffs' Counsel:*

Ford contends that Grimshaw's counsel repeatedly asked questions containing factual assertions not supported by the record and that this constituted misconduct requiring reversal. Ford cites questions propounded during cross-examination of Mr. Kennedy, Mr. Tubben and Ford's carburetor expert. In many of the examples cited, Ford interposed no objections; in others, the court sustained Ford's objections. More importantly, most of the questions of which Ford now complains were properly asked on cross-examination of Ford's experts. ■ It is well established that wide latitude should be allowed in cross-examining experts on their qualifications and on the reasons given for the opinions expressed. (Evid. Code, § 721; *Dillenbeck v. City of Los Angeles* (1968) 69 Cal.2d 472, 482 [72 Cal.Rptr. 321, 446 P.2d 129]; *Laird v. T. W. Mather, Inc.* (1958) 51 Cal.2d 210, 219 [331 P.2d 617]; *Hope v. Arrowhead & Puritas Waters, Inc.* (1959) 174 Cal.App.2d 222, 230 [344 P.2d 428].)[7] Finally, in none of the instances did Ford even suggest that plaintiff's counsel was guilty of misconduct in asking the questions; it did not cite counsel for misconduct or request an admonishment. ■ A claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and request that the jury be admonished. (E.g., *Sabella v. Southern Pac. Co.* (1969) 70 Cal.2d 311, 318 [74 Cal.Rptr. 534, 449 P.2d 750], cert. den. in *Southern Pacific Co. v. Sabella* (1969) 395 U.S. 960 [23 L.Ed.2d

---

[7]Evidence Code section 721, subdivision (a), provides: "(a) Subject to subdivision (b), a witness testifying as an expert may be cross-examined to the same extent as any other witness and, in addition, may be fully cross-examined as to (1) his qualifications, (2) the subject to which his expert testimony relates, and (3) the matter upon which his opinion is based and the reasons for his opinion."

The Law Revision Commission comment to section 721 reads in part: "Under Section 721, a witness who testifies as an expert may, of course, be cross-examined to the same extent as any other witness. See Chapter 5 (commencing with Section 760). But, under subdivision (a) of Section 721, as under existing law, the expert witness is also subject to a somewhat broader cross-examination: 'Once an expert offers his opinion, however, he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based (Code Civ. Proc., § 1872), and which he took into consideration; and he may be "subjected to the most rigid cross examination" concerning his qualifications, and his opinion and its sources [citation omitted].' Hope v. Arrowhead & Puritas Waters, Inc., 174 Cal.App.2d 222, 230, 344 P.2d 428, 433 (1959)." (29B West's Ann. Evid. Code, p. 56.)

746, 89 S.Ct. 2100]; *Horn* v. *Atchison, T. & S. F. Ry. Co., supra,* 61 Cal.2d 602, 610.)

In light of the length of the trial, the thousands of questions which were asked and the complexity of the factual issues in this case, it was inevitable that some of the questions might assume facts not then in evidence. The few instances in which this may have occurred cannot be characterized as a pervasive course of misconduct. The able trial judge in the instant case did not permit the trial to degenerate into a free-for-all. He exercised firm and fair control over the conduct of the trial, made prompt evenhanded rulings on objections, admonished counsel when necessary, and constantly reminded the jury that what counsel said was not evidence. We find no misconduct of counsel or miscarriage of justice resulting from the form of the questions propounded by plaintiffs' counsel. We find nothing approaching the egregious conduct of counsel or lack of courtroom control by the judge that occurred in *Love* v. *Wolf* (1964) 226 Cal.App.2d 378 [38 Cal.Rptr. 183], cited by Ford to support its contentions.

(4) *Arguments to the Jury*:

Ford contends that counsel for Grimshaw committed prejudicial misconduct during argument to the jury by arguing matters not supported by the evidence, exaggerating, mischaracterizing experts' testimony, arguing evidence which had been excluded, and arguing evidence admitted for a limited purpose as if it had been admitted for all purposes. Ford also complains that in rebuttal argument, Mr. Robinson, arguing for Grimshaw, suggested an improper means of fixing damages.

It is settled that misconduct of counsel in argument to the jury may not be urged for the first time on appeal absent a timely objection and request for admonition in the trial court if timely objection and admonition would have cured the harm. (*Sabella* v. *Southern Pac. Co., supra,* 70 Cal.2d 311, 318; *Horn* v. *Atchison, T. & S. F. Ry. Co., supra,* 61 Cal.2d 602, 610; *Brokopp* v. *Ford Motor Co., supra,* 71 Cal.App.3d 841, 859-860.) Misconduct of counsel during argument may not be raised on appeal where the complaining party's counsel sat silently by during the argument, allowed the alleged improprieties to accumulate without objection, and simply made a motion for a mistrial at the conclusion of the argument. (*Horn* v. *Atchison, T. & S. F. Ry. Co., supra,* 61 Cal.2d 602, 610-611; *Brokopp* v. *Ford Motor Co., supra,* 71 Cal. App.3d 841, 860.) Recently, our high court in in *People* v. *Green, su-*

*pra*, 27 Cal.3d 1, clarified the law on the treatment of a defendant's assignment of prejudicial prosecutorial misconduct in arguments to the jury in a criminal case. The court stated that "the initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected [citation]; if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution." (*Id.*, at p. 34.) Those precepts perforce are applicable to a civil case.

In the case at bench, Ford failed to object to any of the matters of which it now complains during plaintiffs' arguments to the jury. During Mr. Hews' closing argument on behalf of plaintiff Grimshaw, which covers 100 pages of the reporter's transcript, Ford did not interpose a single objection. Nor did Ford make any objection during Mr. Rabin's closing argument on behalf of the Grays. During a recess Ford moved for a mistrial complaining of two matters to which Mr. Hews had referred during his argument: His reference to Ford's knowledge that death would result from defective and negligent design of the Pinto and his reference to a document prepared by Mr. Copp purporting to depict the "crush area" of the Pinto. The court denied the motion, noting that the reference to the document prepared by Mr. Copp but which had not been received in evidence was innocuous and that the reference to deaths as well as injuries was proper under the evidence. Significantly Ford does not now complain of the court's rulings in connection with its motion for a mistrial. Following Mr. Cox' argument on behalf of Ford, Mr. Robinson made the rebuttal argument for plaintiff Grimshaw. Ford made two objections to Robinson's argument. Ford does not assign either of these two remarks by Mr. Robinson as error or misconduct on this appeal. Thus, none of the matters of which Ford now complains were matters to which an objection was interposed and a request for admonition made in the court below. Ford is, therefore, precluded from raising the contentions of misconduct unless they were such as could not have been cured by an admonition.

■ In assessing whether alleged misconduct could have been cured by admonition, a reviewing court must bear in mind the wide latitude accorded counsel in arguing his case to a jury. ""The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evi-

dence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury.""" (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913], overruled on other grounds in *People* v. *Green, supra*, 27 Cal.3d 1, 33, quoting *People* v. *Eggers* (1947) 30 Cal.2d 676, 693 [185 P.2d 1], and *People* v. *Sieber* (1927) 201 Cal. 341, 355-356 [257 P. 64], disapproved on other grounds in *People* v. *Marsh* (1962) 58 Cal.2d 732, 746 [26 Cal.Rptr. 300, 376 P.2d 300].) "Counsel may vigorously argue his case and is not limited to 'Chesterfieldian politeness.'" (*People* v. *Bandhauer* (1967) 66 Cal.2d 524, 529 [58 Cal.Rptr. 332, 426 P.2d 900], cert. den. in *Bandhauer* v. *California* (1967) 389 U.S. 878 [19 L.Ed.2d 167, 88 S.Ct. 178], quoting *Ballard* v. *United States* (9th Cir. 1945) 152 F.2d 941, 943, revd. on other grounds (1946) 329 U.S. 187 [91 L.Ed. 181, 67 S.Ct. 261].) "An attorney is permitted to argue all reasonable inferences from the evidence, . . ." (*Brokopp* v. *Ford Motor Co., supra,* 71 Cal.App.3d 841, 860-861.) "Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds of propriety." (*Beagle* v. *Vasold* (1966) 65 Cal.2d 166, 181-182 [53 Cal.Rptr. 129, 417 P.2d 673].)

Ford contends that Grimshaw's counsel committed prejudicial misconduct in referring to Ford's executives meeting in the "glass house" and deciding to approve the Pinto's fuel tank design with knowledge that it was unsafe and would result in the loss of many lives. Ford argues that although there was evidence that the corporate headquarters of Ford was referred to as the "glass house" there was no evidence of management meetings held there in connection with the Pinto design. The record contains substantial evidence from which it reasonably may be inferred that Ford's management knew that the Pinto was unsafe but nevertheless decided not to alleviate the problem because of cost considerations, and thus that those decisions were made in Ford's corporate headquarters.

Ford contends that Grimshaw's counsel improperly stated, contrary to the evidence, that certain facts were "undisputed" or had been "admitted." For example, Ford argues that Grimshaw's counsel misstated the evidence when he said that basically everyone who had witnessed the accident estimated the speed of the Ford Galaxie which struck the Pinto at about 30 to 40 miles per hour at impact. We find no unfairness or impropriety in counsel's statement. While Grimshaw thought that

the Galaxie had been traveling faster than that before the collision, he testified that before the impact he looked forward and did not actually observe the Galaxie when it struck the Pinto. A witness who avoided colliding with the Gray vehicle testified that the Galaxie car was traveling at a higher speed at impact but he only saw the accident in his rearview mirror. Counsel discussed that witness' testimony before making the statement of which Ford complains.

Ford further contends that Grimshaw's counsel argued evidence that had been excluded and argued evidence received for a limited purpose as though it had been received for all purposes. It refers to Mr. Hews' statement that Mr. Copp testified that Ford engaged in cost-benefit analyses and that there was "plenty of documentation for it." Ford argues that the documentation referred to by Mr. Copp—the "Grush-Saunby Report"—was excluded from evidence so that the statement was improper. However, there was other documentation which illustrated the fact that cost considerations caused Ford to delay incorporating safety features in the fuel tank system of its cars despite the knowledge that there was a need for such improvements. Furthermore, Mr. Copp was permitted to testify that Ford did in fact engage in cost-benefit analyses which balanced life and limb against corporate savings and profits.

Ford assigns a number of other remarks by Grimshaw's counsel as misstatements of the evidence or exaggerations or mischaracterization of testimony. No useful purpose would be served by detailing them. We have examined the record and find that in each of the instances of which Ford complains, the argument was within the bounds of propriety. More importantly, having failed to object below, it was incumbent upon Ford to demonstrate that the claimed improprieties were such that a prompt objection and admonition to the jury would not have corrected the error. Ford has utterly failed to show that in any of the specific instances of claimed misconduct, an objection and admonition would not have remedied the situation.

## IV

### INSTRUCTIONS

Ford complains of instructional errors on design defect and superseding cause.

## (1) *Design Defects*:

Some two weeks before this case went to the jury, the Supreme Court in *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1], formulated the following "two-pronged" definition of design defect, embodying the "consumer expectation" standard and "risk-benefit" test: "First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id.*, at p. 432.) The "relevant factors" which a jury may consider in applying the *Barker* "risk-benefit" standard include "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Id.*, at p. 431.) Under the risk-benefit test, once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden shifts "to the defendant to prove, in light of the relevant factors, that the product is not defective." (*Id.*, at p. 431.)

Ford requested two instructions purporting to set out the *Barker* tests for design defect,[8] but the court gave only the following instruction: "A product is defective in design if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." Ford complains that the failure to give the balance of the other requested instruction constituted

---

[8]The two requested instructions on design defect read: "A product is defective in design if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

"In determining whether or not the Pinto automobile was defectively designed, you may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, the adverse consequences to the product and to the consumer that would result from an alternative design, the extent to which its design and manufacture matched the average quality of other automobiles and the extent to which its design and manufacture deviated from the norm for automobiles designed and manufactured at the same point in time."

prejudicial error. For the reasons set out below, we conclude that the contention lacks merit.

Initially, *Barker* does not mandate a jury instruction on both prongs of the tests in a design defect case. The *Barker* court referred to the two standards for evaluating design defect as "alternative tests" and in its suggested instruction phrased the tests in the disjunctive.[9] (*Id.*, at p. 435.) The court stated that the alternative risk-benefit prong of the *Barker* test was designed to aid the injured party in establishing design defects because "'[i]n many situations ... the consumer would not know what to expect, because he would have no idea how safe the product could be made.'" (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 430, quoting Wade, *On The Nature of Strict Tort Liability for Products* (1973) 44 Miss.L.J. 825, 829; Levy & Ursin, *Tort Law in California: At the Crossroads* (1979) 67 Cal.L.Rev. 497, 503) The court referred to the fact that numerous California decisions have recognized this fact by making it clear "[t]hat a product may be found defective in design even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design." (*Id.*, at p. 430.) Thus, the risk-benefit test was formulated primarily to aid injured persons. The instant case was submitted solely on the consumer expectation standard because the trial had been virtually completed before the *Barker* decision was rendered in which our high court for the first time articulated the risk-benefit standard of design defect.

Ford therefore cannot complain of the failure to instruct on the risk-benefit test. Indeed, had the risk-benefit prong of the design defect instruction as formulated in *Barker* been given, Ford would have been entitled to complain of prejudice. The instruction provides that a product is defective in design if "plaintiff proves that the product's design proximately caused his injury *and the defendant fails to prove*, ... that

---

[9]The *Barker* court held "that a trial judge may properly instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, *or* (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, in light of the relevant factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Barker* v. *Lull Engineering Co., supra,* 20 Cal.3d 413, 435; italics supplied.)

on balance the benefits of the challenged design outweigh the risk of danger inherent in such design." (*Id.*, at p. 435; italics supplied.) Had the jury been so instructed, Ford could have justifiably claimed prejudice because the case had not been tried on the assumption that under a risk-benefit analysis Ford had the burden of proving that the product was not defective.

Finally, even had it been proper to instruct on the risk-benefit test, Ford's requested version of the standard was defective in two important respects. First it omitted the crucial element of the manufacturer's burden of proof in the risk-benefit posture. Nor did Ford offer a separate instruction covering the subject of the burden of proof. Second, the proposed instruction erroneously included among the "relevant factors," "the extent to which its [Pinto's] design and manufacture matched the average quality of other automobiles and the extent to which its design and manufacture deviated from the norm for automobiles designed and manufactured at the same point in time." ██ In a strict products liability case, industry custom or usage is irrelevant to the issue of defect. (*Titus* v. *Bethlehem Steel Corp.* (1979) 91 Cal.App.3d 372 [154 Cal. Rptr. 122]; *Foglio* v. *Western Auto Supply* (1976) 56 Cal.App.3d 470, 477 [128 Cal.Rptr. 545]; see *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 133-134 [104 Cal.Rptr. 433, 501 P.2d 1153].) The *Barker* court's enumeration of factors which may be considered under the risk-benefit test not only fails to mention custom or usage in the industry, the court otherwise makes clear by implication that they are inappropriate considerations. *Barker* contrasts the risk-benefit strict liability test with a negligent design action, stating that "the jury's focus is properly directed to the condition of the product itself, and not to the reasonableness of the manufacturer's conduct. [Citations.] [¶] Thus, [the court explains] "the fact that the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances, while perhaps absolving the manufacturer of liability under a negligence theory, will not preclude the imposition of liability under strict liability principles if, upon hindsight, the trier of fact concludes that the product's design is unsafe to consumers, users, or bystanders. (See *Foglio* v. *Western Auto Supply, supra*, 56 Cal.App.3d 470, 477.)" (*Barker* v. *Lull Engineering Co., supra*, 20 Cal.3d 413, 434.) In *Foglio*, we held that an instruction permitting the jury in a strict products liability case to consider industry custom or practice in determining whether a design defect existed constituted error.

For the reasons stated above, the other instructions Ford requested which would have permitted the jury to consider custom or usage in the trade in determining whether a design defect existed were also properly refused.[10]

### (2) *Superseding Causes*:

Ford requested the following instruction on superseding cause: "If you find that the gasoline tank in the 1972 Pinto automobile was improperly located or protected but that the fire would have occurred even if the tank had been properly located or protected, its location or protection was not a substantial factor in bringing about the fire and was, therefore, not a contributing cause thereof." Instead, the court gave the following instruction: "If you find that the defects alleged to exist in the 1972 Pinto did in fact exist but that the fire and resulting injuries would have occurred even if the defects did not exist, the defects were not a substantial factor in bringing about the fire and therefore were not contributing factors to the resulting injuries." Ford assigns the refusal of its instruction and the giving of the other instruction as error.

Ford contends that one of its defenses to the claims based on the design of the fuel tank and its location and protection was that the impact speed was so great that the fuel tank rupture and fire would have occurred without regard to the location and protection of the fuel tank. It concedes that defense would have been of no avail as to compensatory damages had the jury found that the Pinto stalled on the freeway because of a carburetor defect but that it could have been a defense to punitive damages because that claim rested entirely on Ford's conduct with respect to the fuel tank's design, position and protection. Ford argues that its proffered instruction was "accurate and complete" and tailored to fit its defense based on the fuel tank location and protection

---

[10]Ford offered the following instructions on custom or usage in the trade:

"In determining whether the automobile involved in this case was defective, you may consider (the extent to which) (whether) its design and manufacture conformed to the state of the art or the custom of the trade at the time of its design and manufacture.

"The term, 'state of the art,' as used in the previous instruction, means the practice usually and customarily engaged in by automobile manufacture[r]s in the United States at the time of the design and manufacture of the automobile in this case.

"In determining whether the automobile involved in this case was defective, you may consider (the extent to which) (whether) its design and manufacture matched the average quality of other and (the extent to which) (whether) its design and manufacture deviated from the norm for automobiles designed and manufactured at the same point in time."

and that the instruction given by the court, using the word "defects" instead of the precise claimed defects pertaining to the fuel tank, effectively eliminated Ford's superseding cause defense as to the fuel tank. It argues that under the instruction as given if the jury found only that the carburetor was defective and was a substantial cause of the fire, then it could conclude that all of the claimed defects were substantial causes of the fire and that no superseding cause had intervened. We find no merit in the contentions.

Initially, we note that Ford's proffered instruction was not "accurate and complete." One of the major defects which plaintiffs claimed caused the fire in the interior of the vehicle was the susceptibility of the rear wheel wells to separate from the floor pan. There was substantial evidence to support a finding that such defect existed. Ford's instruction failed completely to take this major defect into account. Second, Ford's argument that use of the word "defect" in the instruction given by the court permitted the jury to conclude that if it found that a defective carburetor was a substantial factor in causing the fire, the other alleged defects relating to location of the fuel tank and the rear structure of the car were then also substantial causes of the fire is such a strained and obscure interpretation that it could not have been indulged by any reasonable juror. None of the attorneys attempted to interpret the instruction in the manner now suggested by Ford. Indeed, argument of counsel on both sides made it clear that the only "defects" referred to in the instruction on superseding cause were those involving the gasoline tank and rear structure of the vehicle, not the carburetor.

Ford's reliance on *Self* v. *General Motors Corp.* (1974) 42 Cal.App. 3d 1 [116 Cal.Rptr. 575], for its contention that the court's instruction was inadequate is misplaced. In *Self,* the trial court failed to give any instruction on superseding cause and the reviewing court held that the failure to give the superseding cause instruction proffered by the defendant was error. (*Id.,* at pp. 10-11.) Here the court refused Ford's version of a superseding cause instruction but gave its own which adequately covered the subject. ■ A party has the right to have the jury instructed on his theory of the case but does not have the right to require his phraseology; the court may modify an instruction or give an instruction of its own in lieu of the one offered provided it correctly instructs the jury on the issue. (*Johns* v. *Ward* (1959) 170 Cal.App.2d 780, 789 [339 P.2d 926]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 193, p. 3013, and cases cited therein.)

# V

## Jury Misconduct

Ford contends that the judgment should be reversed for jury misconduct. This was one of Ford's grounds for a motion for new trial. It filed declarations by its attorneys, Juror Irene Miller, her husband, Juror Goldie Woods and Juror Wilford Colmar. Jurors Woods and Colmar had been excused during trial. The misconduct charged by Juror Miller, her husband and Juror Woods was directed against Juror Dorothy Canfield. The declaration of Juror Colmar stated that he had possibly mentioned to other jurors that he had seen severe burns in World War II and thought that viewing slides of Grimshaw's burns would not bother him but that he was wrong. The declarations by Ford's attorneys said they had interviewed Juror Canfield and that the interview corroborated the charges made by Juror Irene Miller. Plaintiffs filed declarations by Juror Canfield, her husband and 10 other jurors and alternates refuting the charges made in the declarations filed by Ford. We have reviewed all of the declarations and find that the opposing declarations controvert the substance of all of the charges of misconduct, either specifically or by reasonable inferences which may be drawn from the facts alleged in the declarations. As to Juror Colmar's declaration, we fail to see how Ford was prejudiced by his statement that he had seen burn victims during World War II or by his statement that he did not think he would be affected by viewing the Grimshaw slides but was apparently mistaken. The ghastly nature of the burns suffered by Grimshaw was graphically demonstrated by the evidence and was apparent to all the jurors.

In denying Ford's motion for a new trial, the trial court impliedly resolved all conflicts in the declarations in favor of plaintiffs. (*Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 108 [95 Cal.Rptr. 516, 485 P.2d 1132].) ▮ "'When an issue is tried on affidavits ... and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed.'" (*Id.*, at p. 108, quoting *Lynch v. Spilman* (1967) 67 Cal.2d 251, 259 [62 Cal.Rptr. 12, 431 P.2d 636].) It is not our function as a reviewing court to reweigh the evidence, resolve conflicting evidence and inferences, or to judge the credibility of the witnesses. (*Aceves v. Regal Pale Brewing Co., supra,* 24 Cal.3d 502, 507; *Nestle v. City of Santa Monica, supra,* 6 Cal.3d 920, 925.) We find no merit in Ford's jury misconduct contention.

# VI

## Punitive Damages

Ford contends that it was entitled to a judgment notwithstanding the verdict on the issue of punitive damages on two grounds: First, punitive damages are statutorily and constitutionally impermissible in a design defect case; second, there was no evidentiary support for a finding of malice or of corporate responsibility for malice. In any event, Ford maintains that the punitive damage award must be reversed because of erroneous instructions and excessiveness of the award.

### (1) *"Malice" Under Civil Code Section 3294:*

The concept of punitive damages is rooted in the English common law and is a settled principle of the common law of this country. (Owen, *Punitive Damages in Products Liability Litigation* (1976) 74 Mich.L.Rev. 1258, 1262-1263 (hereafter Owen); Mallor & Roberts, *Punitive Damages: Towards A Principled Approach* (1980) 31 Hastings L.J. 639, 642-643 (hereafter Mallor & Roberts); Note, *Exemplary Damages in the Law of Torts* (1957) 70 Harv.L.Rev. 517, 518-520.) The doctrine was a part of the common law of this state long before the Civil Code was adopted. (*Mendelsohn* v. *Anaheim Lighter Co.* (1871) 40 Cal. 657, 661; *Nightingale* v. *Scannell* (1861) 18 Cal. 315, 325-326; *Dorsey* v. *Manlove* (1860) 14 Cal. 553, 555-556; *Wilson* v. *Middleton* (1852) 2 Cal. 54.) When our laws were codified in 1872, the doctrine was incorporated in Civil Code section 3294, which at the time of trial read: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."[11]

---

[11]Section 3294 was amended in 1980 (Stats. 1980, ch. 1242, § 1, p. 4217, eff. Jan. 1, 1981) to read: "(a) In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

"(b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge, ratification, or act of oppres-

Ford argues that "malice" as used in section 3294 and as interpreted by our Supreme Court in *Davis* v. *Hearst* (1911) 160 Cal. 143 [116 P. 530], requires *animus malus* or evil motive—an intention to injure the person harmed—and that the term is therefore conceptually incompatible with an unintentional tort such as the manufacture and marketing of a defectively designed product. This contention runs counter to our decisional law. As this court recently noted, numerous California cases after *Davis* v. *Hearst, supra,* have interpreted the term "malice" as used in section 3294 to include, not only a malicious intention to injure the specific person harmed, but conduct evincing "a conscious disregard of the probability that the actor's conduct will result in injury to others." (*Dawes* v. *Superior Court* (1980) 111 Cal. App.3d 82, 88 [168 Cal.Rptr. 319], hg. den. 12/17/80; e.g., *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 895-896 [157 Cal.Rptr. 693, 598 P.2d 854]; *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 922 [148 Cal.Rptr. 389, 582 P.2d 980]; *Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 922-923 [114 Cal.Rptr. 622, 523 P.2d 662]; *Silberg* v. *California Life Ins. Co.* (1974) 11 Cal.3d 452, 462 [113 Cal.Rptr. 711, 521 P.2d 1103]; *Donnelly* v. *Southern Pacific Co.* (1941) 18 Cal.2d 863, 869-870 [118 P.2d 465]; *Nolin* v. *National Convenience Stores, Inc.* (1979) 95 Cal.App.3d 279, 285-286 [157 Cal. Rptr. 32]; *Seimon* v. *Southern Pac. Transportation Co.* (1977) 67 Cal. App.3d 600, 607 [136 Cal.Rptr. 787]; *G. D. Searle & Co.* v. *Superior Court* (1975) 49 Cal.App.3d 22, 30-32 [122 Cal.Rptr. 218]; *Pease* v. *Beech Aircraft Corp.* (1974) 38 Cal.App.3d 450, 465 [113 Cal.Rptr. 416]; *Barth* v. *B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 240-241 [71 Cal.Rptr. 306]; *Toole* v. *Richardson-Merrell Inc.* (1969) 251 Cal.App.2d 689, 713-714 [60 Cal.Rptr. 398, 29 A.L.R.3d 988].) *Pease, Barth* and *Toole* were strict products liability cases.

In *Taylor* v. *Superior Court, supra,* 24 Cal.3d 890, our high court's most recent pronouncement on the subject of punitive damages, the

---

sion, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

"(c) As used in this section, the following definitions shall apply:

"(1) 'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others.

"(2) 'Oppression' means subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights.

"(3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

court observed that the availability of punitive damages has not been limited to cases in which there is an actual intent to harm plaintiff or others. (*Id.*, at p. 895.) The court concurred with the *Searle* (*G. D. Searle & Co.* v. *Superior Court, supra*, 49 Cal.App.3d 22) court's suggestion that conscious disregard of the safety of others is an appropriate description of the *animus malus* required by Civil Code section 3294, adding: "In order to justify an award of punitive damages on this basis, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he wilfully and deliberately failed to avoid those consequences." (*Id.*, at pp. 895-896.)

Ford attempts to minimize the precedential force of the foregoing decisions on the ground they failed to address the position now advanced by Ford that intent to harm a particular person or persons is required because that was what the lawmakers had in mind in 1872 when they adopted Civil Code section 3294. Ford argues that the Legislature was thinking in terms of traditional intentional torts, such as, libel, slander, assault and battery, malicious prosecution, trespass, etc., and could not have intended the statute to be applied to a products liability case arising out of a design defect in a mass produced automobile because neither strict products liability nor mass produced automobiles were known in 1872.

A like argument was rejected in *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], where the court held that in enacting section 1714 as part of the 1872 Civil Code, the Legislature did not intend to prevent judicial development of the common law concepts of negligence and contributory negligence. As the court noted, the code itself provides that insofar as its provisions are substantially the same as the common law, they should be construed as continuations thereof and not as new enactments (Civ. Code, §§ 4, 5), and thus the code has been imbued "with admirable flexibility from the standpoint of adaptation to changing circumstances and conditions." (*Id.*, at p. 816.) In light of the common law heritage of the principle embodied in Civil Code section 3294,[12] it must be con-

---

[12]The doctrine was expressed in *Dorsey* v. *Manlove, supra*, 14 Cal. 553, as follows: "But where the trespass is committed from wanton or malicious motives, or a reckless disregard of the rights of others, or under circumstances of great hardship or oppression, the rule of compensation is not adhered to, and the measure and amount of damages are matters for the jury alone. In these cases the jury are not confined to the loss or injury sustained, but may go further and award punitive or exemplary damages, as a punishment for the act, or as a warning to others." (*Id.*, at p. 556.)

strued as a "continuation" of the common law and liberally applied "with a view to effect its objects and to promote justice." (Civ. Code, §§ 4, 5.) To paraphrase *Li* v. *Yellow Cab Co., supra*, 13 Cal.3d 804, the applicable rules of construction "permit if not require that section [3294] be interpreted so as to give dynamic expression to the fundamental precepts which it summarizes." (*Id.,* at p. 822.)

The interpretation of the word "malice" as used in section 3294 to encompass conduct evincing callous and conscious disregard of public safety by those who manufacture and market mass produced articles is consonant with and furthers the objectives of punitive damages. The primary purposes of punitive damages are punishment and deterrence of like conduct by the wrongdoer and others. (Civ. Code, § 3294; Owen, *supra*, pp. 1277, 1279-1287; Mallor & Roberts, *supra*, pp. 648-650.) In the traditional noncommercial intentional tort, compensatory damages alone may serve as an effective deterrent against future wrongful conduct but in commerce-related torts, the manufacturer may find it more profitable to treat compensatory damages as a part of the cost of doing business rather than to remedy the defect. (Owen, *supra*, p. 1291; Note, *Mass Liability and Punitive Damages Overkill* (1979) 30 Hastings L.J. 1797, 1802.) Deterrence of such "objectionable corporate policies" serves one of the principal purposes of Civil Code section 3294. (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 820 [169 Cal.Rptr. 691, 620 P.2d 141] cert. den. and app. dismd. *Mutual of Omaha Ins. Co.* v. *Egan* (1980) 445 U.S. 91 [63 L.Ed.2d 597, 100 S.Ct. 1271].) Governmental safety standards and the criminal law have failed to provide adequate consumer protection against the manufacture and distribution of defective products. (Owen, *supra*, pp. 1288-1289; Mallor & Roberts, *supra*, pp. 655-656; *Developments in the Law: Corporate Crime* (1979) 92 Harv.L.Rev. 1227, 1369. See *People* v. *Superior Court* (*Olson*) (1979) 96 Cal.App.3d 181, 191, 196 [157 Cal.Rptr. 628], cert. den. *Forest E. Olson, Inc.* v. *Superior Court of California* (1980) 446 U.S. 935 [64 L.Ed.2d 787, 100 S.Ct. 2152].) Punitive damages thus remain as the most effective remedy for consumer protection against defectively designed mass produced articles. They provide a motive for private individuals to enforce rules of law and enable them to recoup the expenses of doing so which can be considerable and not otherwise recoverable.

We find no statutory impediments to the application of Civil Code section 3294 to a strict products liability case based on design defect.

(2) *Constitutional Attacks on Civil Code Section 3294*:

██ Ford's contention that the statute is unconstitutional has been repeatedly rejected. (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 819; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 66, fn. 13 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Zhadan* v. *Downtown L. A. Motors* (1976) 66 Cal.App.3d 481, 502 [136 Cal.Rptr. 132]; *Wetherbee* v. *United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 272 [95 Cal.Rptr. 678]; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 404-405 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) Ford's argument that its due process rights were violated because it did not have "fair warning" that its conduct would render it liable for punitive damages under Civil Code section 3294 ignores the long line of decisions in this state beginning with *Donnelly* v. *Southern Pacific Co.* (1941) *supra,* 18 Cal.2d 863, 869-870, holding that punitive damages are recoverable in a nondeliberate or unintentional tort where the defendant's conduct constitutes a conscious disregard of the probability of injury to others. (See *Dawes* v. *Superior Court, supra,* 111 Cal.App.3d 82, 88; *Nolin* v. *National Convenience Stores, Inc., supra,* 95 Cal.App.3d 279, 285-286.) The related contention that application of Civil Code section 3294 to the instant case would violate the ex post facto prohibition of the federal Constitution because at the time it designed the 1972 Pinto Ford had no warning that its conduct could be punished under Civil Code section 3294 is equally without merit. This constitutional prohibition extends to criminal statutes and penalties, not to civil statutes. (E.g., *In re Bray* (1979) 97 Cal.App.3d 506, 512 [158 Cal.Rptr. 745]; *Ellis* v. *Dept. of Motor Vehicles* (1942) 51 Cal.App.2d 753, 758 [125 P.2d 521].) Moreover, at the very least since *Toole* v. *Richardson-Merrell, Inc.* (1967) *supra,* 251 Cal.App.2d 689, it should have been clear that a manufacturer of a dangerous, defective product might be liable for punitive damages if it knowingly exposed others to the hazard.

Equally without merit is the argument that the statute permits an unlawful delegation of legislative power because it fails to provide sufficient guidance to the judge and jury. As we have explained, the doctrine of punitive damages and its application are governed by common law principles. Judicial development of common law legal principles does not constitute an unlawful usurpation of legislative power; it is a proper exercise of a power traditionally exercised by the judiciary. The precise contention now advanced has been previously rejected.

(*Toole* v. *Richardson-Merrell, Inc., supra,* 251 Cal.App.2d 689; see *Bertero* v. *National General Corp., supra,* 13 Cal.3d 43, 66, fn. 13.)

The argument that application of Civil Code section 3294 violates the constitutional prohibition against double jeopardy is equally fallacious. This prohibition like the ex post facto concept is applicable only to criminal proceedings. (E.g., *Helvering* v. *Mitchell* (1938) 303 U.S. 391, 399 [82 L.Ed. 917, 921-922, 58 S.Ct. 630]; *Lemer* v. *Boise Cascade, Inc.* (1980) 107 Cal.App.3d 1, 7 [165 Cal.Rptr. 555].)

The related contention that the potential liability for punitive damages in other cases for the same design defect renders the imposition of such damages violative of Ford's due process rights also lacks merit. Followed to its logical conclusion, it would mean that punitive damages could never be assessed against a manufacturer of a mass produced article. No authorities are cited for such a proposition; indeed, as we have seen, the cases are to the contrary. We recognize the fact that multiplicity of awards may present a problem, but the mere possibility of a future award in a different case is not a ground for setting aside the award in this case, particularly as reduced by the trial judge. If Ford should be confronted with the possibility of an award in another case for the same conduct, it may raise the issue in that case. We add, moreover, that there is no necessary unfairness should the plaintiff in this case be rewarded to a greater extent than later plaintiffs. As Professor Owen has said in response to such a charge of unfairness: "This conception ignores the enormous diligence, imagination, and financial outlay required of initial plaintiffs to uncover and to prove the flagrant misconduct of a product manufacturer. In fact, subsequent plaintiffs will often ride to favorable verdicts and settlements on the coattails of the firstcomers." (Owen, *supra,* 74 Mich.L.Rev. at p. 1325, fn. omitted.) That observation fits the instant case.

(3) *Sufficiency of the Evidence to Support the Finding of Malice and Corporate Responsibility:*

Ford contends that its motion for judgment notwithstanding the verdict should have been granted because the evidence was insufficient to support a finding of malice or corporate responsibility for such malice. The record fails to support the contention.

"The rules circumscribing the power of a trial judge to grant a motion for judgment notwithstanding the verdict are well established.

The power to grant such a motion is identical to the power to grant a directed verdict; the judge cannot weigh the evidence or assess the credibility of witnesses; if the evidence is conflicting or if several reasonable inferences may be drawn, the motion should be denied; the motion may be granted "'only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict.'" (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 877-878 [151 Cal.Rptr. 285, 587 P.2d 1098]; *Brandenburg* v. *Pac. Gas & Elec. Co.* (1946) 28 Cal.2d 282, 284 [169 P.2d 909], quoting *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110-111 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282].)" (*Castro* v. *State of California* (1981) 114 Cal.App.3d 503, 512 [170 Cal.Rptr. 734].) ▮ There was ample evidence to support a finding of malice and Ford's responsibility for malice.

Through the results of the crash tests Ford knew that the Pinto's fuel tank and rear structure would expose consumers to serious injury or death in a 20- to 30-mile-per-hour collision. There was evidence that Ford could have corrected the hazardous design defects at minimal cost but decided to defer correction of the shortcomings by engaging in a cost-benefit analysis balancing human lives and limbs against corporate profits. Ford's institutional mentality was shown to be one of callous indifference to public safety. There was substantial evidence that Ford's conduct constituted "conscious disregard" of the probability of injury to members of the consuming public.

Ford's argument that there can be no liability for punitive damages because there was no evidence of corporate ratification of malicious misconduct is equally without merit. ▮ California follows the Restatement rule that punitive damages can be awarded against a principal because of an action of an agent if, but only if, "'(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act.' (Rest.2d Torts (Tent. Draft No. 19, 1973) § 909.)" (*Egan* v. *Mutual of Omaha Ins. Co., supra*, 24 Cal.3d 809, 822; *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416].) The present case comes within one or both of the categories described in subdivisions (c) and (d).

There is substantial evidence that management was aware of the crash tests showing the vulnerability of the Pinto's fuel tank to rupture at low speed rear impacts with consequent significant risk of injury or death of the occupants by fire. There was testimony from several sources that the test results were forwarded up the chain of command; vice president Robert Alexander admitted to Mr. Copp that he was aware of the test results; vice president Harold MacDonald, who chaired the product review meetings, was present at one of those meetings at which a report on the crash tests was considered and a decision was made to defer corrective action; and it may be inferred that Mr. Alexander, a regular attender of the product review meetings, was also present at that meeting. McDonald and Alexander were manifestly managerial employees possessing the discretion to make "decisions that will ultimately determine corporate policy." (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 823.) There was also evidence that Harold Johnson, an assistant chief engineer of research, and Mr. Max Jurosek, chief chassis engineer, were aware of the results of the crash tests and the defects in the Pinto's fuel tank system. Ford contends those two individuals did not occupy managerial positions because Mr. Copp testified that they admitted awareness of the defects but told him they were powerless to change the rear-end design of the Pinto. It may be inferred from the testimony, however, that the two engineers had approached management about redesigning the Pinto or that, being aware of management's attitude, they decided to do nothing. In either case the decision not to take corrective action was made by persons exercising managerial authority. Whether an employee acts in a "managerial capacity" does not necessarily depend on his "level" in the corporate hierarchy. (*Id.,* at p. 822.) As the *Egan* court said: "'Defendant should not be allowed to insulate itself from liability by giving an employee a nonmanagerial title and relegating to him crucial policy decisions.'" (*Id.,* at p. 823, quoting conc. and dis. opn. in *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d at p. 25.)

 While much of the evidence was necessarily circumstantial, there was substantial evidence from which the jury could reasonably find that Ford's management decided to proceed with the production of the Pinto with knowledge of test results revealing design defects which rendered the fuel tank extremely vulnerable on rear impact at low speeds and endangered the safety and lives of the occupants. Such conduct constitutes corporate malice. (See *Toole* v. *Richardson-Merrell, Inc., supra,* 251 Cal.App.2d 689, 713.)

(4) *Instructions on Malice*:

■ In its instructions to the jury, the trial court defined malice as follows: "'Malice' means a motive and willingness to vex, harass, annoy or injure another person. Malice may be inferred from acts and conduct, such as by showing that the defendant's conduct was wilful, intentional, and done in conscious disregard of its possible results." The court also instructed the jury that plaintiff Grimshaw had the burden of proving "[t]hat the defendant acted with malice which may be inferred from defendant's conduct if the conduct was wilful, intentional, and done in conscious disregard of its possible results."

On appeal, Ford contends that the phrase "conscious disregard of its possible results" used in the two instructions would permit a plaintiff to impugn almost every design decision as made in conscious disregard of some perceivable risk because safer alternative designs are almost always a possibility. Ford argues that to instruct the jury so that they might find "malice" if any such "possibility" existed was erroneous; it maintains that an instruction on "malice" in products liability must contain the phrase "conscious disregard of [the probability/a high probability] of injury to others," in order to preclude prejudicial error. Ford cites *Dawes* v. *Superior Court, supra*, 111 Cal.App.3d 82, recently decided by this court, for its authority.

The instruction on malice as given by the court was former BAJI No. 14.71 with a one-word modification. BAJI No. 14.71 then read in pertinent part: "'Malice' means a motive and willingness to vex, harass, annoy or injure another person. Malice . . . may be inferred from acts and conduct such as by showing that the defendants' conduct, was wilful, intentional, and done in reckless disregard of its possible results." The instruction as given merely substituted the word "conscious" for the word "reckless."[13] The phrase "wilful, intentional and done in reckless disregard of its possible results" used in former BAJI No. 14.71 seems to have made its first appearance in *Toole* v. *Richardson-Merrell Inc., supra*, 251 Cal.App.2d 689, 713. The *Toole* formulation has been repeated since in a number of decisions, e.g., *Trammell* v. *Western*

---

[13]The 1980 revision of BAJI uses the expression "conscious disregard of the plaintiff's rights." The trial court's substitution in the instant case was apparently in response to *G. D. Searle & Co.* v. *Superior Court* (1975) *supra*, 49 Cal.App.3d 22, 29-32, which criticized the use of the term "reckless" in defining malice and suggested that "conscious disregard" would be a more accurate expression of the required state of mind.

*Union Tel. Co.* (1976) 57 Cal.App.3d 538, 557 [129 Cal.Rptr. 361]; *Black* v. *Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362, 369 [72 Cal.Rptr. 157], and *Schroeder* v. *Auto Driveaway Co.* (1974) *supra*, 11 Cal.3d 908, 923. In *Schroeder*, the Supreme Court approved the *Toole* expression of the kind of behavior which would support a punitive award, stating: "But 'intent,' in the law of torts, denotes not only those results the actor desires, but also those consequences which he knows are substantially certain to result from his conduct. (Rest.2d Torts, § 8a; Prosser, Torts (4th ed. 1971) pp. 31-32.) The jury in the present case could reasonably infer that defendants acted in callous disregard of plaintiffs' rights, knowing that their conduct was substantially certain to vex, annoy, and injure plaintiffs. Such behavior justifies the award of punitive damages. As stated in *Toole* v. *Richardson-Merrell Inc.* (1967) 251 Cal.App.2d 689, 713 [60 Cal.Rptr. 398, 29 A.L.R.3d 988]: 'malice in fact, sufficient to support an award of punitive damages ... may be established by a showing that the defendant's wrongful conduct was wilful, intentional, and done in reckless disregard of its possible results.' [Citation.]" (*Schroeder* v. *Auto Driveaway Co., supra*, 11 Cal.3d 908, 922; fns. omitted.)

In *Dawes* v. *Superior Court, supra*, 111 Cal.App.3d 82, 88, this court noted that "since 1974 at the latest, and probably since a much earlier date, the term 'malice' as used in Civil Code section 3294 has been interpreted as including a conscious disregard of the *probability* that the actor's conduct will result in injury to others." (Italics supplied.) Our use of the term "probability" was not intended to effect a change in the law as set forth in *Toole, Schroeder*, and the other cases which have echoed the *Toole* formulation. Rather, it was meant to reflect correctly what the cases have been stating, albeit in varying ways, as an essential ingredient of the concept of malice in unintentional torts (*Taylor* v. *Superior Court, supra*, 24 Cal.3d 890, 895-896; *Schroeder* v. *Auto Driveaway Co., supra*, 11 Cal.3d 908, 922; *Donnelly* v. *Southern Pacific Co., supra*, 18 Cal.2d 863, 869-870; *Nolin* v. *National Convenience Stores Inc., supra*, 95 Cal.App.3d 279, 285-287), and to express this essential ingredient in the most precise manner possible. Although the *Toole* formulation of the rule used the expression "possible results," those words were preceded by the pejoratives "wilful," "intentional" and "reckless disregard." Taking the statement as a whole, it is our view that probability that the conduct will result in injury to another is implicit in *Toole*. This was also apparently how the Supreme Court viewed it in *Schroeder*. We agree with Ford, however, that to be as accurate as possible, the rule should be expressed in terms of probability

of injury rather than possibility. Viewed in this way, the salient question for this appeal becomes whether the instruction given by the court resulted in a miscarriage of justice because it failed to use "probability." As we explain below, we are convinced that it did not.

■ A judgment may not be set aside on the ground the jury was misdirected unless a reviewing court, after an examination of the entire cause, including the evidence, shall be of the opinion that the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; *Cucinella* v. *Western Biscuit Co.* (1954) 42 Cal.2d 71, 82 [265 P.2d 513]; *Popejoy* v. *Hannon* (1951) 37 Cal.2d 159, 168-169 [231 P.2d 484]; *Kostecky* v. *Henry* (1980) 113 Cal.App.3d 362, 374 [170 Cal.Rptr. 197].) Prejudice from an erroneous instruction is never presumed; it must be effectively demonstrated by the appellant. (*Kostecky* v. *Henry, supra,* 113 Cal.App.3d 362, 374; *Brokopp* v. *Ford Motor Co., supra,* 71 Cal. App.3d 841, 853-854.) One of the factors to be considered in measuring the effect of an erroneous instruction is whether a party's argument to the jury may have given the instruction a misleading effect. (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946]; *Kostecky* v. *Henry, supra,* 113 Cal.App. 3d 362, 374-375.) Finally, an instruction should be interpreted in a manner that will support rather than defeat a judgment if it is reasonably susceptible to such an interpretation. (*Kostecky* v. *Henry, supra,* 113 Cal.App.3d 362, 375; *Merlo* v. *Standard Life & Acc. Ins. Co., supra,* 59 Cal.App.3d 5, 14; *Rupp* v. *Summerfield* (1958) 161 Cal.App.2d 657, 667 [326 P.2d 912].)

■ Applying the above precepts to the instant case, Ford has failed to demonstrate prejudice from the claimed defect in the instructions on malice. When the instructions are read as a whole, the jury could not possibly have interpreted the words "conscious disregard of its possible results" to extend to the innocent conduct depicted by Ford. The term "motive and willingness . . . to injure" and the words "wilful," "intentional," and "conscious disregard" signify *animus malus* or evil motive. As the *Searle* court explained, the term "conscious disregard" itself denotes a "highly culpable state of mind." (49 Cal.App.3d at p. 32.) The jury was instructed that Ford was not required under the law to produce either the safest possible vehicle or one which was incapable of producing injury. The instructions on malice manifestly referred to conduct constituting conscious and callous disregard of a substantial likelihood of injury to others and not to innocent conduct by the manufacturer. Further, plaintiffs made no attempt in their argu-

ments to the jury to give the instructions on malice the interpretation to which Ford says they are susceptible. Plaintiffs did not argue possibility of injury; they argued that injury was a virtual certainty and that Ford's management knew it from the results of the crash tests. Thus, the instructions on malice, even assuming them to have been erroneous because the word "possible" was used instead of "probable," did not constitute prejudicial error.

(5) *Burden of Proof on Issue of Malice*:

 Ford argues that the jury should have been instructed that plaintiff had the burden of proving "malice" by "clear and convincing evidence." Ford's request for such an instruction was denied. Ford relies on cases involving the personal liberty of an individual (*Addington* v. *Texas* (1979) 441 U.S. 418 [60 L.Ed.2d 323, 99 S.Ct. 1804]; *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]; *People* v. *Thomas* (1977) 19 Cal.3d 630 [139 Cal.Rptr. 594, 566 P.2d 228]; *People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352]) which are manifestly inapposite. A similar contention was rejected in *Toole* v. *Richardson-Merrell Inc., supra*, 251 Cal.App.2d 689, 716, where the court refused to give an instruction that a defendant against whom punitive damages are sought is entitled to the presumption of innocence. Furthermore, the Supreme Court has recently rejected the clear and convincing test in a punitive damage case based upon fraud. (*Liodas* v. *Sahadi* (1977) 19 Cal.3d 278, 286-293 [137 Cal.Rptr. 635, 562 P.2d 316].) The requested instruction on the burden of proof was properly denied.

(6) *Amount of Punitive Damage Award*:

 Ford's final contention is that the amount of punitive damages awarded, even as reduced by the trial court, was so excessive that a new trial on that issue must be granted. Ford argues that its conduct was less reprehensible than those for which punitive damages have been awarded in California in the past; that the $3 1/2 million award is many times over the highest award for such damages ever upheld in California; and that the award exceeds maximum civil penalties that may be enforced under federal or state statutes against a manufacturer for marketing a defective automobile. We are unpersuaded.

 In determining whether an award of punitive damages is excessive, comparison of the amount awarded with other awards in other

cases is not a valid consideration. (*Bertero v. National General Corp., supra,* 13 Cal.3d 43, 65, fn. 12; *Leming v. Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 355-356 [282 P.2d 23, 51 A.L.R.2d 107]; *Crane v. Smith* (1943) 23 Cal.2d 288, 302 [144 P.2d 356].) Nor does "[t]he fact that an award may set a precedent by its size" in and of itself render it suspect; whether the award was excessive must be assessed by examining the circumstances of the particular case. (*Rodriguez v. Mc-Donnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 654-655 [151 Cal. Rptr. 399]; see *Niles v. City of San Rafael* (1974) 42 Cal.App.3d 230, 241 [116 Cal.Rptr. 733].) In deciding whether an award is excessive as a matter of law or was so grossly disproportionate as to raise the presumption that it was the product of passion or prejudice, the following factors should be weighed: The degree of reprehensibility of defendant's conduct, the wealth of the defendant, the amount of compensatory damages, and an amount which would serve as a deterrent effect on like conduct by defendant and others who may be so inclined. (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 928; *Rosener v. Sears, Roebuck & Co.* (1980) 110 Cal.App.3d 740, 750-751 [168 Cal.Rptr. 237].) Applying the foregoing criteria to the instant case, the punitive damage award as reduced by the trial court was well within reason.[14]

 In assessing the propriety of a punitive damage award, as in assessing the propriety of any other judicial ruling based upon factual determinations, the evidence must be viewed in the light most favorable to the judgment. (*Neal v. Farmers Ins. Co., supra,* 21 Cal.3d 910, 922.) Viewing the record thusly in the instant case, the conduct of Ford's management was reprehensible in the extreme. It exhibited a conscious and callous disregard of public safety in order to maximize corporate profits. Ford's self-evaluation of its conduct is based on a review of the evidence most favorable to it instead of on the basis of the evidence most favorable to the judgment. Unlike malicious conduct di-

[14]A quantitative formula whereby the amount of punitive damages can be determined in a given case with mathematical certainty is manifestly impossible as well as undesirable. (Mallor & Roberts, *supra,* 31 Hastings L.J. 639, 666-667, 670.) The authors advocate abandonment of the rule that a reasonable relationship must exist between punitive damages and actual damages. They suggest that courts balance society's interest against defendant's interest by focusing on the following factors: Severity of threatened harm; degree of reprehensibility of defendant's conduct, profitability of the conduct, wealth of defendant, amount of compensatory damages (whether it was high in relation to injury), cost of litigation, potential criminal sanctions and other civil actions against defendant based on same conduct. (*Id.,* at pp. 667-669.) In the present case, the amount of the award as reduced by the judge was reasonable under the suggested factors, including the factor of any other potential liability, civil or criminal.

rected toward a single specific individual, Ford's tortious conduct endangered the lives of thousands of Pinto purchasers. Weighed against the factor of reprehensibility, the punitive damage award as reduced by the trial judge was not excessive.

Nor was the reduced award excessive taking into account defendant's wealth and the size of the compensatory award. Ford's net worth was $7.7 billion and its income after taxes for 1976 was over $983 million. The punitive award was approximately .005 percent of Ford's net worth and approximately .03 percent of its 1976 net income. The ratio of the punitive damages to compensatory damages was approximately 1.4 to 1. Significantly, Ford does not quarrel with the amount of the compensatory award to Grimshaw.

Nor was the size of the award excessive in light of its deterrent purpose. An award which is so small that it can be simply written off as a part of the cost of doing business would have no deterrent effect. An award which affects the company's pricing of its product and thereby affects its competitive advantage would serve as a deterrent. (See *Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d 910, 929, fn. 14.) The award in question was far from excessive as a deterrent against future wrongful conduct by Ford and others.

Ford complains that the punitive award is far greater than the maximum penalty that may be imposed under California or federal law prohibiting the sale of defective automobiles or other products. For example, Ford notes that California statutes provide a maximum fine of only $50 for the first offense and $100 for a second offense for a dealer who sells an automobile that fails to conform to federal safety laws or is not equipped with required lights or brakes (Veh. Code, §§ 24007, 24250 et seq.; 26300 et seq.; 42000; 42001); that a manufacturer who sells brake fluid in this state failing to meet statutory standards is subject to a maximum of only $50 (Bus. & Prof. Code, § 13800 et seq.); and that the maximum penalty that may be imposed under federal law for violation of automobile safety standards is $1,000 per vehicle up to a maximum of $800,000 for any related series of offenses (15 U.S.C. §§ 1397-1398). It is precisely because monetary penalties under government regulations prescribing business standards or the criminal law are so inadequate and ineffective as deterrents against a manufacturer and distributor of mass produced defective products that punitive damages must be of sufficient amount to discourage such practices. Instead of showing that the punitive damage award was excessive, the comparison

between the award and the maximum penalties under state and federal statutes and regulations governing automotive safety demonstrates the propriety of the amount of punitive damages awarded.

### Grimshaw's Appeal

 Grimshaw has appealed from the order conditionally granting Ford a new trial on the issue of punitive damages and from the amended judgment entered pursuant to that order.[15]

Grimshaw contends that the new trial order is erroneous because (1) the punitive damages awarded by the jury were not excessive as a matter of law, (2) the specification of reasons was inadequate; and (3) the court abused its discretion in cutting the award so drastically. For reasons to be stated, we have concluded that the contentions lack merit.

The court prefaced its specification of reasons with a recitation of the judicially established guidelines[16] for determining whether a punitive award is excessive. The court then observed that there was evidence in the record (referring to exhibit 125) which might provide a possible rational basis for the $125 million jury verdict which would dispel any presumption of passion or prejudice,[17] adding, however, that the court was not suggesting that the amount was warranted "or that the jury did utilize Exhibit 125, or any other exhibits, and if they did, that they were justified in so doing." The court then noted, based on the fact that Ford's net worth was $7.7 billion and its profits during the last quarter of the year referred to in the financial statement introduced into evidence were more than twice the punitive award, that the award was not disproportionate to Ford's net assets or to its profit generating capacity. The court noted, however, that the amount of the punitive award was 44 times the compensatory award, the court stated that while it did not

---

[15]A consent to a reduction in the judgment does not preclude a plaintiff from filing a cross-appeal where the opposing party appeals despite the consent to a remittitur. (*Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 918, fn. 1; *Miller v. National American Life Ins. Co.* (1976) 54 Cal.App.3d 331, 341-345 [126 Cal.Rptr. 731].)

[16]The court stated that "the principles by which the propriety of the amount of punitive damages awarded will be judged are threefold: (1) Is the sum so large as to raise a presumption that the award was the result of passion and prejudice and therefore excessive as a matter of law; (2) Does the award bear a reasonable relationship to the net assets of the defendant; and (3) Does the award bear a reasonable relationship to the compensatory damages awarded."

[17]Exhibit 125 was the report by Ford engineers showing savings which would be realized by deferring design changes to the fuel system of Ford automobiles to meet the proposed governmental standards on the integrity of the fuel systems.

consider that ratio alone to be controlling because aggravating circumstances may justify a ratio as high as the one represented by the jury verdict, it reasoned that the ratio coupled with the amount by which the punitive exceeded the compensatory damages (over $122 million) rendered the jury's punitive award excessive as a matter of law.

█ Grimshaw contends that the court erred in determining that the ratio of punitive to compensatory damages rendered the punitive excessive as a matter of law. The trial court, however, did not base its decision solely on the ratio of punitive to compensatory. It took into account the ratio, the "aggravating circumstances" (the degree of reprehensibility), the wealth of the defendant and its profit generating capacity, the magnitude of the punitive award, including the amount by which it exceeded the compensatory. Those were proper considerations for determining whether the award was excessive as a matter of law. (*Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 824; *Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 927-928; *Rosener* v. *Sears, Roebuck & Co., supra,* 110 Cal.App.3d 740, 752-754; *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469-470 [136 Cal. Rptr. 653].) █ When a trial court grants a new trial for excessive damages, either conditionally or outright, a presumption of correctness attaches to the order and it will not be reversed unless it plainly appears that the judge abused his discretion. (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 933; *Doolin* v. *Omnibus Cable Co.* (1899) 125 Cal. 141, 144-145 [57 P. 774].) In the case at bench, we find no abuse of discretion.

Grimshaw also contends that the order granting a new trial was invalid for lack of adequate specification of reasons. We find that contention equally lacking in merit. █ When a motion for new trial is granted for excessive damages the specification of reasons should indicate the respects in which the evidence dictated a smaller verdict but, as the court observed in *Neal* (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910), different considerations bear upon the adequacy of the reasons where the amount of punitive rather than compensatory damages is the primary concern. (*Id.,* at p. 932.) In such cases the specification is adequate if it reveals how the court applied the decisional guidelines for assessing the propriety of the amount of the punitive damage award to the evidence in the particular case. This the trial court did in the instant case. Its specification of reasons adequately enables a reviewing court to determine whether there is a substantial basis in law and fact for the order granting the conditional new trial.

Finally, Grimshaw contends the court abused its discretion in reducing the award to $3 1/2 million as a condition of its new trial order and urges this court to restore the jury award or at least require a remittitur of substantially less than that required by the trial court.

■ In ruling on a motion for new trial for excessive damages, the trial court does not sit "in an appellate capacity but as an independent trier of fact." (*Neal* v. *Farmers Ins. Exchange, supra,* 21 Cal.3d 910, 933.) This role as a fact finder is conferred on the trial court by Code of Civil Procedure section 662.5 which provides that if a new trial limited to the issue of damages would be proper after a jury trial, "the trial court may in its discretion: . . . (b) If the ground for granting a new trial is excessive damages, make its order granting the new trial subject to the condition that the motion for a new trial is denied if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court *in its independent judgment determines from the evidence to be fair and reasonable.*" (Italics supplied.) In addition, Code of Civil Procedure section 657 provides that an order granting a new trial for excessive damages shall be reversed "only if there is no substantial basis in the record for" the reasons stated in the judge's specification of reasons. An appellate court may reverse the order granting the new trial only when the reasons given by the trial judge reflect a manifest and unmistakable abuse of discretion. (*Delos* v. *Farmers Ins. Group* (1979) 93 Cal.App.3d 642, 663 [155 Cal.Rptr. 843]; *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 109 [95 Cal.Rptr. 516, 485 P.2d 1132]; *Mazzotta* v. *Los Angeles Ry. Corp.* (1944) 25 Cal.2d 165, 169 [153 P.2d 338].)

Here, the judge, exercising his independent judgment on the evidence, determined that a punitive award of $3 1/2 million was "fair and reasonable." Evidence pertaining to Ford's conduct, its wealth and the savings it realized in deferring design modifications in the Pinto's fuel system might have persuaded a different fact finder that a larger award should have been allowed to stand. Our role, however, is limited to determining whether the trial judge's action constituted a manifest and unmistakable abuse of discretion. Here, the judge referred to the evidence bearing on those factors in his new trial order and obviously weighed it in deciding what was a "fair and reasonable" award. We cannot say that the judge abused the discretion vested in him by Code of Civil Procedure section 662.5 or that there is "no substantial basis in the record" for the reasons given for the order. Finally, while the trial judge may not have taken into account Ford's potential liability for pu-

nitive damages in other cases involving the same tortious conduct in reducing the award, it is a factor we may consider in passing on the request to increase the award. Considering such potential liability, we find the amount as reduced by the trial judge to be reasonable and just. We therefore decline the invitation to modify the judgment by reducing the amount of the remittitur.

## DISPOSITION

In *Grimshaw* v. *Ford Motor Co.*, the judgment, the conditional new trial order, and the order denying Ford's motion for judgment notwithstanding the verdict on the issue of punitive damages are affirmed.

## THE GRAYS' CASE

### FORD'S APPEAL

Ford has filed a single appellant's opening brief on its appeal from the Grimshaw and Grays judgments and has advanced the same contentions for the reversal of both judgments except that Ford's contentions respecting punitive damages only pertain to the Grimshaw judgment. Ford does not attack the sufficiency of the evidence to establish its liability to the Grays or to support the amount of compensatory damages awarded to them.[18]

For all of the reasons stated in our opinion on Ford's appeal from the Grimshaw judgment, Ford's attacks upon the Grays' judgment must fail. Ford has failed to demonstrate in either appeal that any errors or irregularities that may have occurred during the trial resulted in a miscarriage of justice.

### THE GRAYS' CROSS-APPEAL

The Grays have cross-appealed from the judgment to the extent that they were precluded from seeking punitive damages.[19] The Grays'

[18]Ford makes a bare assertion that damages in the Grays case were "extremely high." The award was $659,680. Plaintiffs were the surviving husband and 2 minor daughters, ages 12 and 13, who had been adopted by the couple at birth. At the time of her death, Mrs. Gray was 51. She had worked full time and had been earning at least $20,000 a year as of the date of trial. Evidence of the economic loss alone resulting from her death was approximately $260,000. In addition, the surviving heirs lost the comfort and society of a devoted wife and mother. The verdict was by no means excessive as a matter of law and Ford does not so contend.

[19]The Grays also purport to appeal from an order denying their motion for leave to amend their complaint to seek punitive damages. Such an order is nonappealable and

motion to amend their complaint to add allegations seeking punitive damages was denied on the ground such damages are not recoverable in a wrongful death action. The issue is whether the Grays should have been granted leave to amend.

The Grays advance three theories on which they predicate their arguments that denial of leave to amend constituted prejudicial error: (1) Because the executor or administrator of Mrs. Gray's estate could have sought punitive damages in an action under Probate Code section 573, the fact that the heirs, rather than the personal representative, were attempting to recover punitive damages was merely a technical irregularity which should have been disregarded in the interest of justice; (2) the California rule barring recovery of punitive damages in wrongful death actions is the product of an erroneous interpretation of the pertinent statutes; and (3) to the extent that the California statute prohibits heirs from recovering punitive damages, it is violative of the equal protection clauses of the state and federal Constitutions. In the ensuing analysis we have concluded that none of the theories advanced by the Grays support their contention that denial of leave to amend their complaint to seek punitive damages constituted error. We have concluded: (1) The rationale of *Klopstock* v. *Superior Court* (1941) 17 Cal.2d 13 [108 P.2d 906, 135 A.L.R. 318], cited in support of the first theory is inapplicable; (2) the California rule on punitive damages in wrongful death actions did not arise out of statutory misinterpretation; and (3) denying heirs the right to seek punitive damages in a wrongful death action where such right survived the decedent and could have been asserted by the personal representative of the decedent's estate under Probate Code section 573 does not offend the equal protection clauses of the state and federal Constitutions.

I

Preliminarily, we undertake a brief review of the history of our wrongful death statute insofar as it is pertinent to the contentions advanced by the Grays.

California's first wrongful death statute (Stats. 1862, ch. 330, §§ 1, 3, pp. 447-448) which was patterned closely after Lord Campbell's Act

the appeal therefrom must be dismissed. (*Tu-Vu Drive-In Corp.* v. *Davies* (1967) 66 Cal.2d 435, 436, fn. 2 [58 Cal.Rptr. 105, 426 P.2d 505].) The order, however, is reviewable on an appeal from the final judgment in the action. (*Schaefer* v. *Berinstein* (1960) 180 Cal.App.2d 107, 114 [4 Cal.Rptr. 236], disapproved on other grounds, *Jefferson* v. *J. E. French Co.* (1960) 54 Cal.2d 717, 719, 720 [7 Cal.Rptr. 899, 355 P.2d 643]; *Fuss* v. *City of Los Angeles* (1958) 162 Cal.App.2d 643, 646 [328 P.2d 831].)

(see 15 Holdsworth, A History of English Law, p. 220) provided that "in every such action, the jury may give such damages, pecuniary and exemplary, as they shall deem fair and just, ..." (Stats. 1862, ch. 330, § 3, p. 448.) When the statute was codified in 1872, the damage provision read: "In every such action, the jury may give such damages, pecuniary or exemplary, as under all the circumstances of the case, may to them seem just." (See Deering's Code Civ. Proc. Annot., §§ 339-419, p. 237.)

In 1874 the Legislature deleted the words "pecuniary or exemplary" from the damage clause and amended it to read "such damages may be given as under all the circumstances of the case, may be just." (*Id.*) Our Supreme Court's pronouncement in *Lange v. Schoettler* (1896) 115 Cal. 388, 391-392 [47 P. 139], concerning the intended effect of the 1874 amendment led to the accepted rule in this state that punitive damages are not recoverable in a wrongful death action. The court stated that the purpose of the 1874 amendment "must have been to take away the right to exemplary damages, and to make the rule accord with the general rule elsewhere" so that damages could not include "any grievance personal to the deceased, or any damage allowed in the interest of the people as punishment." In support of these conclusions, the court cited several of its earlier cases: *Pepper v. Southern Pacific Co.* (1895) 105 Cal. 389 [38 P. 974]; *Morgan v. Southern Pacific Co.* (1892) 95 Cal. 510 [30 P. 603]; and *Munro v. Dredging etc. Co.* (1890) 84 Cal. 515 [24 P. 303]. *Munro* held that the California statute, like those of other jurisdictions, allowed damages for pecuniary loss to designated relatives, including deprivation of "comfort, society, support, and protection," but excluded mental suffering and "exemplary or vindictive damages." (*Id.,* at p. 527.)[20]

---

[20]*Lange v. Schoettler, supra,* 115 Cal. 388, gave no explanation for the deletion of the word "pecuniary" as well as "exemplary." A commentator has noted that under the *Lange* rationale, it could have been said that the Legislature must have intended to deny "pecuniary," as well as exemplary, damages in wrongful death cases. (McClelland & Truett, *Survival of Punitive Damages in Wrongful Death Cases,* 8 U.S.F. L.Rev. 585, 605.) Despite the amendment, however, subsequent decisional law developed a theory that damages for wrongful death were recoverable only for the "pecuniary" loss suffered by the heirs. (E.g., *Valente v. Sierra Railway Co.* (1909) 158 Cal. 412, 418-419 [111 P. 95]; *Hale v. San Bernardino etc. Co.* (1909) 156 Cal. 713, 718 [106 P. 83].) Nevertheless, as our Supreme Court recently noted in *Krouse v. Graham* (1977) 19 Cal.3d 59, 67 [137 Cal.Rptr. 863, 562 P.2d 1022], courts have uniformly allowed recovery for the "pecuniary value" of the loss of the society, comfort, care and protection offered by the deceased. Were the question one of first impression, it might be argued that the 1874 amendment deleting the words "pecuniary and exemplary" was intended to broaden rather than restrict recoverable damages in a wrongful death action.

The statute remained virtually unchanged until 1949 when the Legislature, in the wake of *Hunt* v. *Authier* (1946) 28 Cal.2d 288 [169 P.2d 913, 171 A.L.R. 1379], enacted Civil Code section 956 providing for survival of personal injury causes of action.[21] Contemporaneously, the Legislature amended Code of Civil Procedure section 377 (the wrongful death statute) to provide that damages that may be awarded under that section shall not include those recoverable under Civil Code section 956 and for the joinder of actions under Civil Code section 956 with wrongful death actions and for their consolidation for trial if separately filed.[22] (Stats. 1949, ch. 1380, p. 2400.) The survival statute provided that where the person entitled to maintain the action "dies before judgment," the damages recoverable "shall be limited to loss of earnings and expenses sustained or incurred as a result of the injury by the deceased prior to his death, and shall not include damages for pain, suffering or disfigurement, nor *punitive or exemplary* damages, ..." (Italics supplied.)

---

[21]Former Civil Code section 956 provided: "A thing in action arising out of a wrong which results in physical injury to the person or out of a statute imposing liability for such injury shall not abate by reason of the death of the wrongdoer or any other person liable for damages for such injury, nor by reason of the death of the person injured or of any other person who owns any such thing in action. When the person entitled to maintain such an action dies before judgment, the damages recoverable for such injury shall be limited to loss of earnings and expenses sustained or incurred as a result of the injury by the deceased prior to his death, and shall not include damages for pain, suffering or disfigurement, nor punitive or exemplary damages, nor prospective profits or earnings after the date of death. The damages recovered shall form part of the estate of the deceased. Nothing in this article shall be construed as making such a thing in action assignable."

[22]As amended in 1949, Code of Civil Procedure section 377 read: "When the death of a person not being a minor, or when the death of a minor person who leaves surviving him either a husband or wife or child or children or father or mother, is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death, or in the case of the death of such wrongdoer, against the personal representative of such wrongdoer, whether the wrongdoer dies before or after the death of the person injured. If any other person is responsible for any such wrongful act or neglect, the action may also be maintained against such other person, or in case of his death, his personal representatives. In every action under this section, such damages may be given as under all the circumstances of the case, may be just, but shall not include damages recoverable under Section 956 of the Civil Code. The respective rights of the heirs in any award shall be determined by the court. Any action brought by the personal representatives of the decedent pursuant to the provisions of Section 956 of the Civil Code may be joined with an action arising out of the same wrongful act or neglect brought pursuant to the provisions of this section. If an action be brought pursuant to the provisions of this section and a separate action arising out of the same wrongful act or neglect be brought pursuant to the provisions of Section 956 of the Civil Code, such actions shall be consolidated for trial on the motion of any interested party." (See Stats. 1949, ch. 1380, pp. 2401-2402.)

In 1961, the Law Revision Commission recommended revisions of the statutes relating to the survival of tort causes of action. (See 3 Cal.Law Revision Com. Rep. (1961) p. F-1.) It recommended adoption of Probate Code section 573,[23] which expressly provided for the survival of a cause of action for punitive or exemplary damages.[24] (*Id.*, at p. F-7.) In recommending survival of a claim for exemplary damages, the commission stated: "The provision in the 1949 legislation that the right to recover punitive or exemplary damages is extinguished by the death of the *injured party* should not be continued. There are no valid reasons for this limitation. True, such damages are in a sense a windfall to the plaintiff's heirs or devisees, but since these damages are not compensatory in nature, they would have constituted a windfall to the decedent as well. The object of awarding such damages being to punish the wrongdoer, it would be particularly inappropriate to permit him to escape such punishment in a case in which he killed rather than only injured his victim." (*Id.*) The commission did not recommend any changes in the wrongful death statute (Code Civ. Proc., § 377) except that the reference to Civil Code section 956 be changed to Probate Code section 573. (*Id.*, at p. F-9.) The Legislature enacted Probate Code section 573 and amended Code of Civil Procedure section 377 as recommended by the commission.

---

[23]Included in Probate Code section 573 were matters formerly covered by Civil Code section 956 and Probate Code section 574.

Probate Code section 573 provides: "Except as provided in this section no cause of action shall be lost by reason of the death of any person but may be maintained by or against his executor or administrator.

"In an action brought under this section against an executor or administrator all damages may be awarded which might have been recovered against the decedent had he lived except damages awardable under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant.

"When a person having a cause of action dies before judgment, the damages recoverable by his executor or administrator are limited to such loss or damage as the decedent sustained or incurred prior to his death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had he lived, and shall not include damages for pain, suffering or disfigurement.

"This section is applicable where a loss or damage occurs simultaneously with or after the death of a person who would have been liable therefor if his death had not preceded or occurred simultaneously with the loss or damage.

"Nothing in this section shall be construed as making assignable things in action which are of such a nature as not to have been assignable prior to the enactment of the 1961 amendment to this section."

[24]The commission also recommended that damages for pain and suffering and disfigurement be allowed under section 573, but the Legislature decided to continue to exclude such damages. (3 Cal.Law Revision Com. Rep., *supra*, pp. F-1, F-7.)

■ Since the 1961 amendments to the survival and wrongful death statutes, our courts have reaffirmed the long-standing view that the wrongful death statute does not permit recovery of exemplary damages. (*Cortez* v. *Macias* (1980) 110 Cal.App.3d 640, 657 [167 Cal.Rptr. 905], hg. den. Nov. 26, 1980; *Umansky* v. *Urquhart* (1978) 84 Cal. App.3d 368, 372 [148 Cal.Rptr. 547]; *Stencel Aero Engineering Corp.* v. *Superior Court* (1976) 56 Cal.App.3d 978, 983 [128 Cal.Rptr. 691]; *Pease* v. *Beech Aircraft Corp., supra,* 38 Cal.App.3d 450, 461-462; *Doak* v. *Superior Court* (1968) 257 Cal.App.2d 825 [65 Cal.Rptr. 193, 27 A.L.R.3d 1362].) In *Pease* v. *Beech Aircraft Corp., supra,* the court based its decision on *Lange* v. *Schoettler* and its progeny and on the further ground that the 1961 legislation made damages recoverable under the survival and wrongful death statutes "mutually exclusive." Finally, in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 450 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], our Supreme Court declared: "The California statutes and decisions . . . have been interpreted to bar the recovery of punitive damages in a wrongful death action. (See *Pease* v. *Beech Aircraft Corp.* (1974) 38 Cal.App.3d 450, 460-462 [113 Cal.Rptr. 416] and authorities there cited.)"

■ Punitive damages are, however, recoverable in an action under Probate Code section 573 by the personal representative of the decedent's estate if the decedent survived the accident, however briefly, or if the property of the decedent was damaged or lost before death. (*Stencel Aero Engineering Corp.* v. *Superior Court, supra,* 56 Cal.App.3d 978, 987-988; see *Pease* v. *Beech Aircraft Corp., supra,* 38 Cal.App.3d 450, 459-460.) There need not be a pending action at the time of death; it is sufficient that the claim arose before death. (*Dunwoody* v. *Trapnell* (1975) 47 Cal.App.3d 367, 369-370 [120 Cal.Rptr. 859].)

We address the Grays' various contentions in light of the foregoing legislative and decisional background.

## II

The premise of the Grays' first argument is that because Mrs. Gray survived the accident for three days, her personal representative would have been entitled to seek punitive damages in an action under Probate Code section 573. It is urged therefore that the fact the heirs, rather than the personal representative, were the ones seeking to recover punitive damages was a technical irregularity which should have been

disregarded in the interest of justice, citing *Klopstock* v. *Superior Court, supra*, 17 Cal.2d 13.

The contention mistakes the significance of *Klopstock, supra*, 17 Cal.2d 13. In that case, the personal representative of an heir of decedent brought an action to enforce a claim which could only be enforced by the personal representative of decedent's estate.[25] Defendants demurred on the ground the action was not brought by the real party in interest but the demurrer was overruled and the case went to trial resulting in a plaintiff's judgment. On defendants' appeal, the judgment was reversed on the ground the action had not been prosecuted by the real party in interest, i.e., by the personal representative of the estate of the deceased. (*Samter* v. *Klopstock Realty Co.* (1939) 31 Cal.App.2d 532, 535 [88 P.2d 250].) On remand, plaintiff moved to file an amended complaint naming the personal representative of the estate as the party plaintiff. Defendants responded with a motion to dismiss the action on the ground the jurisdictional defect could not be cured by an amendment. The court denied the motion to dismiss and granted leave to file the amended complaint. Defendants thereupon sought a writ of mandate in the reviewing court to compel the superior court to dismiss the action. The Supreme Court held that while the power to permit amendments is not unlimited and an amendment that introduces a wholly new cause of action is impermissible, "the test is whether an attempt is made to state facts which give rise to a wholly distinct and different legal obligation against the defendant. The power to permit amendment is denied only if a change is made in the liability sought to be enforced against the defendant." (*Klopstock* v. *Superior Court, su-*

---

[25]The rationale for the rule that only the personal representative of the deceased can maintain certain types of actions is explained in *Holland* v. *McCarthy* (1918) 177 Cal. 507, 509-510 [171 P. 421]: "To permit ... [an heir] to maintain an action of any character affecting [decedent's] property, whether for the direct recovery thereof or to determine an adverse right thereto, is well calculated to lead to inevitable confusion and inconvenience. There might be legatees under a will, or heirs other than the one suing, or creditors of the decedent entitled to ... money in payment of their claims, none of whom would be affected by the judgment. Assuming that in the case at bar and upon issue joined upon all the allegations of the complaint, judgment had been rendered for the defendants, such judgment would be ineffectual as a plea in bar to an action against the same defendants for the same property brought by the administrator of the estate. One having possession of money or property of a decedent at the time of the latter's death should not, at the suit of an heir, be called upon at his peril to deliver or pay it over unless he can conclusively establish for all time that there was no will, no legatees, no creditors of the estate, and no other heirs, without all of which he could not be exempt from liability, nor unless a judgment therein rendered in his favor would protect him in subsequent litigation for the same property by other heirs or the personal representatives of the deceased."

*pra*, 17 Cal.2d 13, 20.) The court concluded that inasmuch as the action was brought to enforce the same obligation which the substituted plaintiff was seeking to enforce, the amendment was properly allowed in furtherance of justice.

In the case at bench the Grays never attempted to allege a cause of action under Probate Code section 573, nor did the personal representative attempt to join as a party plaintiff for the purpose of pleading such a cause of action. The heirs simply moved to amend their wrongful death cause of action to seek punitive damages. ▉ A cause of action under the survival statute is separate and distinct from a cause of action for wrongful death under Code of Civil Procedure section 377. (*Larcher* v. *Wanless* (1976) 18 Cal.3d 646, 656-657 [135 Cal.Rptr. 75, 557 P.2d 507]; *Earley* v. *Pacific Electric Ry. Co.* (1917) 176 Cal. 79, 80-81 [167 P. 513]; see *Lewis* v. *City and County of San Francisco* (1971) 21 Cal.App.3d 339, 341 [98 Cal.Rptr. 407].) Thus, the *Klopstock* rationale is inapposite to the validity of the trial court's order denying the Grays' motion to amend the wrongful death cause of action to seek punitive damages.

### III

The Grays next maintain that the California rule barring punitive damages in a wrongful death case is predicated on an erroneous interpretation of the relevant statutes. They argue that the 1961 amendments to the survival statute reflect a shift in state policy concerning the right of heirs to recover exemplary damages in wrongful death cases.

While the 1961 amendments to the survival statute may have created an arguable statutory ambiguity concerning the right to seek punitive damages in a wrongful death action, we cannot ascribe to the enactment of the amendments a legislative intent to so provide.[26] ▉ It is

[26]Were it not for the long history of decisional law interpreting our wrongful death statute and the rule that the Legislature is presumed to be aware of judicial decisions interpreting a statute when it amends the statute, a persuasive argument might be made that Probate Code section 573 as adopted in 1961, when read in conjunction with Code of Civil Procedure section 377, was meant to allow punitive damages to be recovered in wrongful death actions; that in prohibiting recovery in wrongful death actions of damages which are "recoverable" in survival actions, the Legislature intended only to prevent "double recovery" of damages when two suits are filed involving the same death. (See McClelland & Truett, 8 U.S.F. L.Rev., *supra*, 585, 595, fn. 49.) The anomaly of allowing punitive damages if a victim lived even a few moments after injury, while denying them if the victim died instantaneously would be avoided by so interpreting the statutes.

a generally accepted principle that in adopting or amending statutes, the Legislature is presumed to have acted with knowledge of existing domestic judicial decisions and to have enacted or amended statutes in light of such decisions as have a direct bearing on the legislative action taken. (*Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874]; *Alter v. Michael* (1966) 64 Cal.2d 480, 482-483 [50 Cal.Rptr. 553, 413 P.2d 153], disapproved on other grounds, *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 190-191 [98 Cal.Rptr. 837, 491 P.2d 421]; *Buckley v. Chadwick* (1955) 45 Cal.2d 183, 200 [288 P.2d 12, 289 P.2d 242].) When the Legislature enacted Probate Code section 573 in 1961, it must be presumed to have been aware of the long-standing judicial interpretation of our wrongful death statute with respect to punitive damages, with the result that had it intended to allow recovery of such damages in wrongful death actions, it would have expressly amended Code of Civil Procedure section 377 so to provide. Continued adherence after 1961 to the view that our wrongful death statute does not permit recovery of punitive damages is not the product of statutory misinterpretation.

## IV

Finally, the Grays contend, to the extent that our wrongful death statute precludes recovery of punitive damages, it is violative of the equal protection provisions of the federal and state Constitutions.[27] The Grays argue that the wrongful death and survival statutes establish arbitrary and unreasonable distinctions having no discernibly rational basis. They urge that there is no reasonable basis for treating heirs in a wrongful death action differently from a personal representative asserting a right of action under the survival statute and, in a broader context, for denying heirs a right given to all other victims of a wrongdoer's malicious conduct.

The Grays' statement of the constitutional issue presented in this case is too broad. The question before us is not whether our wrongful death statute offends equal protection guarantees because it denies heirs generally the right to seek punitive damages in a wrongful death action.

---

[27] Article I, section 7 of the California Constitution provides in part: "(a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws; ..."

Article IV, section 16, subdivision (a), of the California Constitution provides: "(a) All laws of a general nature have uniform operation."

The question is whether the statute is discriminatory because it denies the right to seek such damages to the class of heirs of which the Grays are members.

The anomaly of a wrongdoer being subject to punitive damages if he causes injury but not if he causes death was substantially ameliorated by the 1961 legislation providing for survival of punitive damage claims. Under the statute, the claim survives if decedent had a cause of action under Probate Code section 573 at the time of death. If an interval of time, however brief, elapses between injury to the person or to his or her property and death, the claim survives; but a claim for punitive damages will not lie if death occurs simultaneously with the infliction of the injury.[28] (See *Stencel Aero Engineering Corp.* v. *Superior Court, supra,* 56 Cal.App.3d 978, 987-988; *Pease* v. *Beech Aircraft Corp., supra,* 38 Cal.App.3d 450, 459-460.) The 1961 legislation thus created two classes of heirs in wrongful death actions: (1) Heirs whose decedent had a claim for punitive damages at death and (2) heirs whose decedent died without a surviving claim for such damages. Because this classification was the result of legislative action, it is an appropriate classification for equal protection analyses. (See *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 862 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505].) Moreover, because Mrs. Gray survived for three days after the accident, her heirs are members of the first class.

Two recent decisions, one by a state Court of Appeal and the other by the United States Court of Appeals for the Ninth Circuit have rejected equal protection challenges to the preclusion of punitive damages under our wrongful death statute. (*Georgie Boy Manufacturing, Inc.* v. *Superior Court* (1981) 115 Cal.App.3d 217 [171 Cal.Rptr. 382]; *In re Paris Air Crash* (9th Cir. 1980) 622 F.2d 1315, cert. den. *Kalinsky* v. *General Dynamics Corp.,* 449 U.S. 976 [66 L.Ed.2d 237, 101 S.Ct. 387].) The United States Ninth Circuit Court of Appeals found what it considered to be several rational bases for the legislative classification. *Georgie Boy* determined that legislative concern for the danger of excessive punitive damage awards in cases involving death provided a sufficient discernible legislative purpose. The court was also of the view that the unbroken line of cases for some 90 years holding that punitive damages are not recoverable in wrongful death cases imports tacit and

---

[28] When life ends, as well as when it begins, has long been a controversial subject in legal and medical circles. It may well be a medical rarity for death to occur simultaneously with the infliction of a death-causing injury.

implied approval of the constitutionality of Code of Civil Procedure section 377. The foregoing considerations together with the *In re Paris Air Crash* decision persuaded the court to rule in favor of constitutionality.

Neither case, however, analyzes the constitutional issue in terms of the classes of heirs affected by the statutory bar against recovery of punitive damages in wrongful death actions. A statutory scheme which would punish a tortfeasor if he inflicts death-causing injury which does not result in simultaneous death but would not punish if death occurs instantaneously is difficult to explain on the basis of any conceivable, realistic, rational legislative purpose.[29] However, resolution of the equal protection issue presented in this case does not require us to determine whether a rational basis can be found to explain the anomaly. The question before us is whether a law which denies to heirs of a decedent who died with a claim for punitive damages extant the right to recover such damages in a wrongful death action violates equal protection guarantees. Resolution of this issue does not turn on whether heirs of the other class are entitled to seek such damages in a wrongful death action.

---

[29]Both *Georgie Boy Manufacturing, Inc.* v. *Superior Court, supra*, 115 Cal.App.3d 217, and *In re Paris Air Crash, supra*, 622 F.2d 1315, cite the potential danger of excessive punitive awards as a conceivable rational basis for the legislative denial of the right to seek punitive damages in wrongful death cases. Neither decision, however, seems to have taken into account the fact that courts not only have the power but that it is their duty to set aside or modify "excessive" damage awards. In addition, as the *Georgie Boy* court candidly noted, there are no empirical data which would support the fears of large verdicts should punitive damages be recoverable in wrongful death cases. (*Georgie Boy Manufacturing, Inc.* v. *Superior Court, supra*, 115 Cal.App.3d at p. 225, fn. 4.) Finally, the rationale of danger of excessive punitive damages is difficult to square with the legislation providing for survival of a punitive damage claim enforceable by the personal representative and the joinder of such action with a wrongful death action or consolidation of the actions under the two statutes if they were separately filed.

In *In re Paris Air Crash, supra*, 622 F.2d at page 1321, the court distinguished *Brown* v. *Merlo, supra*, 8 Cal.3d 855, on the ground that the guest's cause of action was of common law origin whereas the wrongful death cause of action is statutory. It is true that our Supreme Court in *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 571-575 [139 Cal.Rptr. 97, 565 P.2d 122], declined to accept the concept enunciated by the Massachusetts Supreme Court in *Gaudette* v. *Webb* (1972) 362 Mass. 60 [284 N.E.2d 222, 229, 61 A.L.R.3d 893] that the right to recover for wrongful death is of common law origin. However, we believe that in the present context at least, there is much to be said for the view expressed by Justice Tobriner in his concurring opinion in *Justus* that a right which was originally statutory in origin may now serve as a source of common law. (19 Cal.3d at p. 586.)

The Ninth Circuit also advanced as one of the justifications for precluding punitive damages in wrongful death cases the rationale that punishment and deterrence are most effective when payment is required to be made by the tortfeasor directly to the victim. (622 F.2d at p. 1323.) The observance of the suggested ritual is about as mean-

The equal protection test in the present context is the "traditional," "rational basis," or "restraint" standard of review. (*Steed* v. *Imperial Airlines* (1974) 12 Cal.3d 115, 123-124 [115 Cal.Rptr. 329, 524 P.2d 801, 68 A.L.R.3d 1204]; see *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 580-581 [139 Cal.Rptr. 97, 565 P.2d 122].) Our Supreme Court has refrained from selecting a linguistic formulation from among the various alternatives for expressing this standard, declaring that they all require "'the court to conduct "a serious and genuine judicial inquiry into the correspondence between a classification and the legislative goals."'" (*Cooper* v. *Bray* (1978) 21 Cal.3d 841, 848 [148 Cal.Rptr. 148, 582 P.2d 604], quoting *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254], italics deleted.) The test is not whether there is a theoretically conceivable state purpose that would support the classification but whether "there is a realistically conceivable legislative purpose which rationally justifies the disparate treatment . . . ." (*Cooper* v. *Bray, supra*, 21 Cal.3d 841, 851; *Brown* v. *Merlo, supra*, 8 Cal.3d 855, 865, fn. 7.)

 Given that the primary purposes of punitive damages are punishment and deterrence of like conduct by the wrongdoer and others, a rational justification exists for the legislative denial of the right to seek punitive damages to the class of persons who are heirs of a decedent whose claim for such damages survived and was enforceable by the personal representative. Where such claim survives and is recoverable in an action by the personal representative of the decedent (*Dunwoody* v. *Trapnell, supra*, 47 Cal.App.3d 367, 369), to grant the heirs an additional, separate and independent right to recover punitive damages in a wrongful death action would permit double punishment for the same tortious conduct and could also lead to double recovery of punitive damages by the heirs. The purpose of punishment and deterrence will have been served by the enforcement of the punitive damage claim that survived the decedent.[30] There is a likelihood that the heirs would share in the personal representative's recovery of such damages.

---

ingful to the law of punitive damages as the common law ritual of livery of seisin is to modern conveyancing. It is even less persuasive than the arguments rejected in *Brown* v. *Merlo, supra*, 8 Cal.3d 855, 865, 878, that a rational basis for the guest statute was the protection of a generous host from an ungrateful guest or the prevention of collusive lawsuits.

[30]It might be argued that the amount of exemplary damages recoverable by the personal representative in an action under Probate Code section 573 might not be large

We conclude that whether or not it would be a denial of equal protection to preclude heirs of a decedent who died without a surviving claim for punitive damages from seeking such recovery, the class of heirs of which the Grays are members has not suffered a denial of equal protection by being barred from seeking punitive damages in a wrongful death action.

DISPOSITION

The judgment in *Gray* v. *Ford Motor Co.* is affirmed.

McDaniel, J., concurred.

KAUFMAN, J.—Although I agree with the ultimate disposition of each issue, I am unable to subscribe en toto to those portions of the opinion relating to Copp's testimony concerning the reasons for his termination by Ford, the alleged violations of the order *in limine*, and the design defect instructions. Accordingly, I concur in the judgments and in the opinion except as to those portions.

A petition for a rehearing was denied June 18, 1981, and the petitions of appellant Ford Motor Company and appellants Gray et al. for a hearing by the Supreme Court were denied September 10, 1981.

---

enough to serve as punishment and deterrence if the amount of compensatory damages recoverable in such action is small. The ratio of exemplary to compensatory damages, however, is only one of the many factors to be considered in determining the reasonableness of an award of exemplary damages. Indeed, as we noted in the Grimshaw section of this opinion, commentators have criticized use of the ratio of exemplary to compensatory damages as a factor for consideration in assessing the propriety of an exemplary damage award and have recommended its abandonment. (Fn. 15, *ante.*) We agree with the commentators; the focus should be on the severity of the threatened harm, reprehensibility of the conduct, wealth of defendant, and profitability of the conduct.